Wayne CHASTAIN, Appellant,

v.

Don SUNDQUIST.

No. 86–5386.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 12, 1987.

Decided Nov. 6, 1987.

Bernard Fensterwald III, Arlington, Va., for appellant.

Steven R. Ross, General Counsel to the Clerk, U.S. House of Representatives, with whom Charles Tiefer, Deputy General Counsel to the Clerk and Janina Jaruzelski, Asst. Counsel to Clerk, U.S. House of Representatives, Washington, D.C., were on the brief, for appellee.

Before MIKVA, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge MIKVA.

BUCKLEY, Circuit Judge:

A member of Congress acting within the scope of his authority claims official immunity from a common law defamation suit. This claim of privilege has never been approved by the Supreme Court or recognized in this or any other circuit. We reaffirm the common law rule and settled constitutional design that elected representatives must answer for libelous statements made outside the scope of their legislative duties.

Appellant Wayne Chastain, a staff attorney employed by the Memphis Area Legal Services, Inc., alleges that appellee Congressman Don Sundquist, representing the Seventh District of Tennessee, libeled appellant in a two-page letter sent to the Attorney General and released by Sundquist to the media and in a letter sent to the Legal Services Corporation. The district court, in a brief opinion delivered from the bench, dismissed the action, holding that the posting of the letters to the Attorney General and the Legal Services Corporation was an official act of a legislator immune from suit under the Speech or Debate Clause of the Constitution, art. I, § 6, cl. 1, and the release of the letter to

the media was within the scope of Sundquist's official duties and therefore absolutely immune from common law suit under the reasoning of *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and supporting cases. Appendix for Appellant (App.) at 103–07.

We find that the communication between Congressman Sundquist and the executive branch is not protected by Speech or Debate immunity. As to appellee's decision to publicize his views in the media and to the executive branch, we hold that members of Congress are not entitled to immunity for common law torts committed while acting within the scope of their official duties but outside the sphere protected by the Speech or Debate Clause. Accordingly, we reverse the order of the district court dismissing appellant's complaint.

## I. BACKGROUND

Chastain and other attorneys associated with Memphis Area Legal Services ("MALS") have been involved since 1978 in a legal dispute with the Juvenile Court of Memphis and Shelby County. The Juvenile Court supervises the collection of child support payments from parents. MALS has alleged that the procedures the Juvenile Court uses to collect these payments violate the constitutional rights of indigent parents. In 1984, Chastain, on behalf of MALS, successfully argued to the Sixth Circuit that indigent parents under custodial interrogation for non-payment of support are entitled to counsel and that those responsible for subsequent illegal jailing could be held liable for damages. *See Sevier v. Turner,* 742 F.2d 262 (6th Cir.1984). The protracted controversy also includes allegations that the Juvenile Court has a financial incentive to collect payments from indigents receiving federal and state assistance. *Id.* at 265; Brief for Appellant at 4–7.

On January 14, 1985, appellee wrote the letter to then-Attorney General William French Smith that is at issue in this litigation. App. at 12–13. Typed on official congressional stationery, the five-paragraph letter noted his concern that MALS

might be obstructing the administration of the Child Support Enforcement laws. The third paragraph turned directly to the activities of appellant:

> Also MALS seems to be employing at least one attorney, Wayne Chastain, to do nothing but harass Juvenile Court Judge Kenneth A. Turner and court referees Curtis S. Person Jr. and William Ray Ingram. Mr. Chastain works in concert with two convicted felons, Paul A. Savarin and Richard E. Love. These individuals and Mrs. Alma Morris, the MALS client council chairperson, call frequent press conferences and stage street demonstrations against the Juvenile Court.

*Id.* at 12.

In the fourth paragraph, appellee states his concern that

> these individuals, utilizing the services, staff, and facilities of a federally funded agency, should be allowed to launch such a concerted effort to discredit a major federally funded child support enforcement program.

*Id.*

In light of "alleged irregularities" and the "possibility of the obstruction" of law, the letter urged that the Attorney General conduct "whatever ... investigation [he] deem[s] appropriate." *Id.* at 13. The letter also noted the legislative background— unanimous approval in the House and Senate of an "Administration backed bill to strengthen the collection of delinquent child support payments." *Id.*

Appellant alleges that a copy of the letter, along with a press release, was distributed to the media in Memphis, "including the *Commercial Appeal,* a daily newspaper which has a circulation in excess of 200,000 subscribers in four states, various other publications, radio stations and television stations." Brief for Appellant at 7; App. at 2, 5. According to the complaint, appellee repeated "some" of the letter's defamatory allegations at a civic luncheon in Memphis. App. at 3.

On February 13, 1985, appellee wrote to the Legal Services Corporation ("LSC") reiterating his concern about MALS and his belief that it was obstructing enforcement of the child support laws. He stated his belief that MALS was engaged in "lobbying activities—activities which I believe are contrary to the purpose and goals of the LSC and actually serve to obstruct the administration of federal law." App. at 17. No individuals were named in this second letter. In response, the LSC sent an investigator, Steven Aronson, who conducted a five-day investigation. Appellee thereafter held a press conference, reporting that the situation at MALS was "even worse" than imagined. Brief for Appellant at 10. Appellant twice thereafter sought a retraction, to no avail.

Appellant filed suit on December 9, 1985 in the Superior Court of the District of Columbia alleging five counts of defamation. Appellee removed the case to the federal district court, where he filed a motion to dismiss based on official immunity. The court granted the motion, holding that the communications with the Attorney General and the LSC were protected by the Speech or Debate Clause. App. at 104. The release to the press, said the court, fell within the *Barr* grant of absolute immunity to federal officials for common law torts. App. at 106.

## II. DISCUSSION

### A. *The Speech or Debate Clause*

We first dispose of the issue whether appellee's letters sent to the Attorney General and the LSC constitute legislative activity protected by the Speech or Debate Clause. U.S. Const. art. I, § 6, cl. 1 ("for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."). Appellee essentially concedes the issue in his brief, stating forthrightly that he is not claiming Speech or Debate immunity. Brief for Appellee at 10. The district court, on the other hand, ruled without explanation that the interbranch communications are protected by the constitutional provision, so we briefly address the issue. *See* App. at 104.

■ The Speech or Debate Clause protects all lawmaking activities undertaken in the House and Senate, but affords no constitutional immunity beyond its carefully defined scope. Thus actions taken in committee hearings, proceedings, and reports, or by vote, even though not always literally "words spoken in debate," *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 204, 26 L.Ed. 377 (1880), fall within the constitutional zone of protection. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Should a member choose to publish even an exact copy of a speech delivered in Congress, however, he loses his constitutional protection. *Hutchinson v. Proxmire*, 443 U.S. 111, 133, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979) (press releases are "primarily means of informing those outside the legislative forum").

This basic schema makes one fact of legislative life exceedingly clear. The Clause protects only "purely legislative activities," *United States v. Brewster*, 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed. 2d 507 (1972)—i.e., acts inherent in the legislative process. As the Supreme Court has stated,

> [i]nsofar as the Clause is construed to reach ... matters [beyond speech or debate], they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel v. United States*, 408 U.S. at 625, 92 S.Ct. at 2627. The Clause thus does not protect acts that are not "legislative in nature," even if they are taken in a member's "official capacity." *Id.; Walker v. Jones*, 733 F.2d 923, 929 (D.C.Cir.1984) (the Speech or Debate privilege does not extend to "official activities of Congress members

... outside the legislative core." (internal quotation marks omitted)).

In *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Supreme Court applied these principles to facts in many respects similar to those in the case at bar, and held the activities fell outside the ambit of the Speech or Debate Clause. The plaintiff in *Proxmire* had sued a member of Congress for making allegedly defamatory statements in a widely distributed press release and in several telephone calls to executive agencies. In discussing the press release, the Supreme Court stated that "the transmittal of ... information by individual Members in order to inform the public ... is not a part of the legislative function or the deliberations that make up the legislative process." *Id.* at 133, 99 S.Ct. at 2687. The Court therefore held that the Speech or Debate Clause did not protect the issuance of the press release. With regard to the telephone calls, the Court stated that "[r]egardless of whether and to what extent the Speech or Debate Clause may protect calls to federal agencies seeking information, it does not protect attempts to influence the conduct of executive agencies...." *Id.* at 121 n. 10, 99 S.Ct. at 2681 n. 10; *see also Doe v. McMillan*, 412 U.S. at 313, 93 S.Ct. at 2025 ("Members of Congress may frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct 'though generally done, is not protected legislative activity.'" (quoting *Gravel v. United States*, 408 U.S. at 625, 92 S.Ct. at 2627)). Because the Court found that the purpose of the telephone calls was to influence executive officials, the Court held that the calls were not protected activity under the Speech or Debate Clause.

■ *Proxmire* compels the conclusion that the Speech or Debate Clause protects none of the statements that Chastain challenges in his complaint. Sundquist's statements to the public, via press release and press conference, do not constitute legislative activity and therefore do not fall within the scope of the Speech or Debate Clause. Similarly, Sundquist's letters to

the Attorney General and the Legal Services Corporation are not shielded by the Clause. These letters did not seek information or otherwise attempt to aid a congressional investigation. Rather, they attempted to influence the conduct of federal agencies—an activity that *Proxmire* holds the Speech or Debate Clause does not protect. As the challenged statements are not protected by the Clause, we turn to consider whether the judicially created doctrine of official immunity should be extended by this court to members of Congress.

### B. *Official Immunity*

Numerous Supreme Court decisions describe the framework governing immunity from damage suit by various federal and state officials. The Constitution affords absolute immunity to the President from civil damage actions challenging his official acts, *Nixon v. Fitzgerald,* 457 U.S. 731, 749–56, 102 S.Ct. 2690, 2701–04, 73 L.Ed.2d 349 (1982), and members of Congress for "purely legislative activities" covered by the Speech or Debate Clause. *United States v. Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537. Beyond that, the Court has fashioned an extra-constitutional body of immunity law to supplement the grants of immunity contained in the Constitution. *See Butz v. Economou,* 438 U.S. 478, 501–02, 98 S.Ct. 2894, 2908, 57 L.Ed.2d 895 (1978) ("It has been observed more than once that the law of privilege as a defense to damages actions against officers of Government has 'in large part been of judicial making.'" (quoting *Barr,* 360 U.S. 564 at 569, 79 S.Ct. 1335, 1338, 3 L.Ed.2d 1434 (1959)). The Court has sought to tailor the minimum immunity required to permit the effective discharge of an official's responsibilities. Relying on common law precedent, the Court long ago extended absolute immunity to judges, *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872), and other officials who exercise "quasi-judicial" authority, including prosecutors, *Yaselli v. Goff,* 12 F.2d 396 (2d Cir.1926), *aff'd per curiam,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), and grand jurors, *see Imbler v. Pachtman,* 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 991 n. 20, 47

L.Ed.2d 128 (1976). The immunity was made absolute because of the predictable prospect that individuals subject to a judge, prosecutor, or grand juror's unfavorable decision would bring suit and no lesser protection would suffice.

It has taken the Court longer to work out the contours of immunity for executive officials. Because executive officials, the President aside, have no constitutional immunity from suit, the Court has struggled to devise an appropriate scheme to deal with officials of different rank and obligations defending against common law, statutory, and constitutional tort suits. The present scheme is perhaps easier to describe than explain.

■ For most executive officials, the immunity from all suits alleging constitutional and statutory violations is limited to a qualified defense whereby officials are held answerable only if they violate "clearly established" law. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982) ("We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (qualified immunity for high-ranking federal officials); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (parallel protection for state officials).

■ For a limited subset of officials when defending against actions for damages (the President, prosecutors, and those executives "engaged in adjudicative functions," *Harlow v. Fitzgerald,* 457 U.S. at 807, 102 S.Ct. at 2732), and for executive officials generally when defending against common law tort suits, the privilege is absolute, meaning the officials have a complete defense entitling them to summary judgment, subject only to the requirement that their actions fall within the outer perimeter of their official duties. *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.

2d 1434 (1959); *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896).

 Although this case represents an effort to extend the reach of official immunity to members of Congress, to date the protection afforded by the Speech or Debate Clause has been seen as sufficient to protect the functional obligations of elected representatives. We read the precedents to go further and state that members of Congress expressly cannot claim immunity from defamatory statements unprotected by the Speech or Debate Clause. As to constitutional and statutory torts, however, this circuit has concluded that members of Congress are entitled to the qualified immunity protection described in *Harlow*. *McSurely v. McClellan*, 753 F.2d 88, 99–102 (D.C.Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). This holding is not directly at issue, however, because we reject appellant's belated effort on appeal to allege constitutional and statutory violations. Brief for Appellant at 24 n.*. The complaint plainly alleges defamation and no more. App. at 1–11. As there also is no doubt that appellee's action—commenting on the operation of MALS, a government-funded operation—falls within the scope of his official duties, we do not address this particular issue further. Therefore, the sole question is whether appellee is entitled to judicially created official immunity against common law torts committed in the course of his official duties.

### 1. Supreme Court Precedent

Despite the absence of a holding directly on point, the Supreme Court in two modern cases expressly supports the principle of congressional liability for defamation arising outside the ambit of the Speech or Debate Clause. *Proxmire*, 443 U.S. at 123–33, 99 S.Ct. at 2682–87; *McMillan*, 412 U.S. at 311–25, 93 S.Ct. at 2024–35.

Petitioners in *McMillan* brought suit against the Superintendent of Documents and the Public Printer, among others, for publishing disparaging statements about individual students named in a congressional report assessing the District of Columbia schools. In response to defendants' assertions of immunity, the Supreme Court reversed the appellate court and expressly refused to extend *Barr*-type immunity. The Court did so precisely because it would not so protect a member of Congress or legislative aide who attacks a "person's good name, reputation, honor, or integrity." *McMillan*, 412 U.S. at 324, 93 S.Ct. at 2030 (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)):

> We conclude that, for the purposes of the judicially fashioned doctrine of immunity, the Public Printer and Superintendent of Documents are no more free from suit in the case before us than would be a legislative aide who made copies of the materials at issue and distributed them to the public at the direction of his superiors. See *Dombrowski v. Eastland*, 387 U.S. 82 [87 S.Ct. 1425, 18 L.Ed.2d 577] (1967). The scope of inquiry becomes equivalent to the inquiry in the context of the Speech or Debate Clause, and the answer is the same. *The business of Congress is to legislate; Congressmen and aides are absolutely immune when they are legislating. But when they act outside the "sphere of legitimate legislative activity,"* Tenney v. Brandhove, 341 U.S., at 376, [71 S.Ct. at 788] *they enjoy no special immunity from local laws protecting the good name or the reputation of the ordinary citizen.*

*Id.* (emphasis added).

Thus, the Court rejects, in the plainest language, the proposition that members of Congress are entitled to immunity from libel actions. The statement is especially striking because the Court in *McMillan* refused to apply the immunity even though the respondents acted within the scope of their official duty and petitioners sought damages for a common law tort. At best, one could attempt to avoid the import of this passage by claiming that it is formally dicta as no congressional defendants were referred to directly. The clarity of the Court's language, as well as its explicit placement in a discussion of *Barr*-type im-

munity from a libel action, makes this reading implausible.

*McMillan* also confirms the pivotal point that the question of congressional common law immunity for libel cannot be considered independently of the Speech or Debate Clause: "The scope of inquiry becomes equivalent to the inquiry in the context of the Speech or Debate Clause, and the answer is the same." *Id.* Pursuant to this line of reasoning, the Court stated:

A Member of Congress may not with impunity publish a libel from the speaker's stand in his home district, and clearly the Speech or Debate Clause would not protect such an act even though the libel was read from an official committee report. The reason is that republishing a libel under such circumstances is not an essential part of the legislative process and is not part of that deliberative process "by which Members participate in committee and House proceedings."

*Id.* 412 U.S. at 314–15, 92 S.Ct. at 2025–26 (footnote and citation omitted).

In *Proxmire*, a scientific researcher conducting experiments funded by the government brought a libel suit against Senator Proxmire upon publication to the press of his "Golden Fleece Award" attacking Hutchinson's work as a gross waste of taxpayer monies. The Court rejected Proxmire's contention that the publication fell within the protection of the Speech or Debate Clause and further rejected the claim that Hutchinson was a public figure. The Court ordered on remand that Proxmire answer for his alleged libel.

The compelling fact of *Proxmire* is that it involved a tort action against a senator for defamation via publication outside Congress, yet the Supreme Court did not announce a doctrine of absolute immunity. On the contrary, the Court again embraced the common law rule of liability for congressional libel, expressly repeating that, " '[a] Member of Congress may not with impunity publish a libel from the speaker's stand in his home district....' " *Proxmire*, 443 U.S. at 130, 99 S.Ct. at 2685 (quoting *Doe v. McMillan*, 412 U.S. 306, 314, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912

(1973)). Equally conclusive, the Court found that "the precedents abundantly support the conclusion that *a Member may be held liable for republishing defamatory statements originally made in either House*," *id.* 443 U.S. at 127–28, 99 S.Ct. at 2684 (emphasis added).

It is also striking that the Court in *Proxmire* broke its rule against reaching constitutional questions when "a dispositive non-constitutional ground is available," *Proxmire*, 443 U.S. at 122, 99 S.Ct. at 2682 (i.e., the case could have been remanded for appellate review of state law issues). If members of Congress in fact enjoy absolute immunity, the Court should instead have avoided the Speech or Debate and First Amendment discussion in its entirety by invoking *Barr*-type immunity. The failure of Senator Proxmire and his counsel to raise an immunity defense cannot explain the Supreme Court's oversight unless one is prepared to credit the Court with a unique willingness to reach for constitutional issues. Nor does it seem plausible that a case can be litigated all the way to the Supreme Court without anyone taking notice of a winning defense. Notwithstanding its evident constitutional overtones, official immunity, as opposed to constitutional Speech or Debate immunity, is a doctrine of judicial creation. *Barr*, 360 U.S. at 569, 79 S.Ct. at 1338; *McMillan*, 412 U.S. at 323, 92 S.Ct. at 2030. It has been implemented by the Court for reasons of policy and not in answer to a party's claim of a legal right.

A more plausible explanation is that the Supreme Court in *Proxmire* perceived no need to address, let alone adopt, a blanket protection against libel suits for members of Congress. As the Court never conceived that elected representatives could invoke judicially created official immunity, the opinion needed to address Speech or Debate immunity only, and having done so, it moved on.

The Court underscored this understanding in *Harlow*, 457 U.S. at 811, 102 S.Ct. at 2734: "In *Gravel*, ... we emphasized that Senators and their aides were absolutely immune only when performing

'acts legislative in nature,' and not when taking other acts even 'in their official capacity.'" (citation omitted). Appellee argues, nevertheless, that the Supreme Court's holding in *Harlow* applies here to prohibit Chastain's damage action against a member of Congress. In particular, appellee asserts that common law tort suits must be dismissed at the summary judgment stage because the alleged defamation violates no clearly established statute or constitutional provision. *See* Brief for Appellee at 19. We do not read *Harlow* to hold that anyone entitled to qualified immunity for constitutional and statutory torts is *ipso facto* entitled to absolute immunity for common law torts.

In this circuit we have construed *Harlow* to approve *Barr*-type absolute immunity for *common law torts*. *McKinney v. Whitfield*, 736 F.2d 766, 768 (D.C.Cir.1984) (citing *Harlow* as "signalling that *Barr* remains good law."). *Independently*, the Court articulated a standard of qualified immunity for federal officials charged with *statutory and constitutional* violations. We reject appellee's reading of *Harlow* as collapsing the two standards. *See Martin v. D.C. Metropolitan Police Dep't*, 812 F.2d 1425, 1431 (D.C.Cir.), *en banc order vacated and rehearing en banc denied*, 824 F.2d 1240 (1987) (The court addresses "common law tort claims under an 'absolute immunity' rubric, and ... constitutional [and statutory] tort claims under a 'qualified immunity' headline. If the double standard is problematic ..., it is nonetheless the framework High Court precedent currently delineates." *Id.*); *see also* Appellee's Memorandum on Motion to Dismiss at 17–18, *Chastain v. Sundquist*, No. 85–4037 (D.D.C. Jan. 31, 1986), App. at 39–40 ("The Plaintiff has alleged no constitutional or statutory violations. Had he done so, a different case would be presented and a *Harlow* analysis would be necessary. Since only the common law tort of defamation is alleged, however, Congressman Sundquist is absolutely immune and the case must be dismissed.").

The dissent cites a footnote in the *McMillan* opinion as suggestive authority for the extension of immunity. *See McMillan*, 412 U.S. at 319 n. 13, 93 S.Ct. at 2028 n. 13 ("Both before and after *Barr*, official immunity has been held applicable to officials of the Legislative Branch. See *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Dombrowski v. Eastland* [387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967)].").

We reject the argument that the *McMillan* footnote signals the availability of absolute or qualified tort immunity. The passage in *McMillan* stating that members of Congress are accountable for libelous statements made outside the scope of their legislative duties, *see supra* at 316, expressly relies on the same two authorities, *Tenney* and *Dombrowski*. The Supreme Court does not contradict itself within the space of six pages.

The footnote's meaning becomes apparent when one examines the references to *Tenney* and *Dombrowski*. The sentence refers to "officials of the Legislative Branch," highlighting, it would seem, a distinction between members of Congress and their aides. This distinction formed the basis for dismissing the suit in *Dombrowski* against Senator Eastland, but not against the counsel to a Senate subcommittee, for acts essentially within the protection of the Speech or Debate Clause:

> It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the Speech or Debate Clause of the Constitution, that legislators engaged "in the sphere of legitimate legislative activity," ..., should be protected not only from the consequences of litigation's results but also from the burden of defending themselves. This Court has held, however, that this doctrine is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves.

387 U.S. at 84–85, 87 S.Ct. at 1427 (internal citations omitted); *see also Eastland*, 421 U.S. at 507, 95 S.Ct. at 1823 (comparing derivative immune status of chief counsel in *Eastland* versus non-immune status of chief counsel in *Dombrowski*).

In *Tenney*, the Court rejected the proposition that the Reconstruction Congress, in exposing state officials to damage suits without express limitation, therefore meant to abrogate the equivalent to federal Speech or Debate immunity traditionally enjoyed by state legislators. *Tenney*, 341 U.S. at 376, 71 S.Ct. at 788. Official immunity, in this context, clearly referred to investigative acts by a state committee acting within its legislative core. In short, the footnote cited by the dissent speaks only of two cases involving activities in essence covered by the Speech or Debate Clause, but arising in a sufficiently oblique circumstance as to preclude direct application of the constitutional provision.

### 2. Considerations of Policy

*McMillan* and *Proxmire* indicate substantial Supreme Court support for appellant Chastain's position. It remains to be seen whether compelling considerations of policy, in the light of the contemporary demands made on members of Congress, undermine the apparent clarity of the Supreme Court's position. This requires a three-step inquiry. First, as we are dealing with judicially created immunity whose foundation resides in the common law, its teachings and reasoning must be consulted. *See, e.g., Butz*, 438 U.S. at 508, 98 S.Ct. at 2911 ("In each case [analyzing official immunity], we have undertaken 'a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it.' " (quoting *Imbler v. Pachtman*, 424 U.S. at 421, 96 S.Ct. at 990)). Second, the arguments in *Barr* in favor of executive immunity must be examined to see if they warrant a parallel extension to members of Congress. Finally, the constitutional context of the Speech or Debate Clause must be examined with care lest an expansion or unique grant of privilege upset part of the Constitution's carefully crafted design.

### a. *The Common Law*

Dating back to 1688, the English Bill of Rights provided "[t]hat the freedome of speech and debates or proceedings in Parlyament ought not to be impeached or questioned in any court or place out of Parlyament." 1 W. & M., 2d sess., c. 2 (1688), *reprinted in* 10 *Halsbury's Statutes* 44, 46 (4th ed. 1985). With slight variation, that provision has been incorporated in the Constitution as the Speech or Debate Clause. Art. I, § 6, cl. 1. *See Eastland*, 421 U.S. at 502, 95 S.Ct. at 1820 (Clause is "a product of the English experience," but "English history does not totally define [its] reach...."). Under the common law, a legislator's liability for defamation and other torts coexisted with, and depended upon, the guarantee of this absolute freedom of speech and debate within the legislature. The liability and the immunity are complementary aspects of representative government as it was intended to operate in this country as well as in England.

In *The King v. Creevey*, 105 Eng.Rep. 102 (K.B.1813), a member of Parliament delivered a speech in the House of Commons accusing the Inspector General of Taxes, Robert Kirkpatrick, of a scheme for underassessing property values in return for "a great annuity." After several newspapers reported an incorrect version of the speech, the defendant sent a paper in Liverpool a correct report and requested that it be published, which was done. Kirkpatrick thereupon brought a libel charge against Creevey for the publication of the report, as opposed to the initial speech in the House.

The facts in *Creevey* parallel with precision the complaint of libelous publication made here by appellant. Both cases charge a legislator with common law libel for publication to the press of statements falling within the scope of official conduct. Both sought damages. Indeed, this case, if anything, presents a less equivocal claim in that the letter published to the press independently set forth the accusation of misconduct; it did not simply replicate a speech made in Congress.

The King's Bench rejected Creevey's immunity defense in terms as conclusive as one reads in the law. Chief Judge Lord Ellenborough, speaking first, put the issue plainly:

A member of [the House of Commons] has spoken what he thought material, and what he was at liberty to speak in his character as a member of that House. So far he was privileged: but he has not stopped there; but unauthorized by the House, has chosen to publish an account of that speech in what he has pleased to call a more corrected form; and in that publication has thrown out reflections injurious to the character of an individual.... Has he a right to reiterate these reflections to the public; and to address them as an oratio ad populum in order to explain his conduct to his constituents? *There is no case in practice, nor I believe any proposition laid down by the best text writers upon the subject, that tends to such a conclusion.*

*Id.* at 104 (emphasis added).

The remaining members of the court confirmed this statement of the common law. *See id.* at 105 ("[E]very member ha[s] privilege of speech in Parliament: *but when he publishe[s] his speech to the world, it then [becomes] the subject of common law jurisdiction....*" (Le Blanc, J.) (emphasis added)).

The case of *The King v. Lord Abingdon,* 170 Eng.Rep. 337 (N.P.1794), cited as controlling in *Creevey* by Judge Grose, states the principle with similar assurance and simplicity. Hence there can be no doubt that under English common law, a member of Parliament would necessarily be "the subject of common law jurisdiction" and made to answer for his allegedly libelous publication to the press. As these cases make clear, it was considered the essence of good government that elected representatives answer for their publications made to the world which "[throw] out reflections injurious to the character of an individual."

The English principle crossed the seas intact to America. Justice Story, citing to *Creevey* and *Lord Abingdon,* confirms the transplant:

[T]he same principles seem applicable to the privilege of debate and speech in Congress. No man ought to have the right to defame others under colour of a performance of the duties of his office.

And if he does so in the actual discharge of his duties in Congress, that furnishes no reason why he should be enabled, through the medium of the press, to destroy the reputation and invade the repose of other citizens. It is neither within the scope of his duty nor in furtherance of public rights or public policy. Every citizen has as good a right to be protected by the laws from malignant scandal and false charges and defamatory imputations, as a member of Congress has to utter them in his seat. If it were otherwise, a man's character might be taken away without the possibility of redress, either by the malice, or indiscretion, or overweening self-conceit of a member of Congress.

1 J. Story, *Commentaries on the Constitution* § 866 at 631–32 (5th ed. 1905) (footnote omitted). Contemporaneous case law supports Story's assessment of legislative exposure to common law libel, *see Coffin v. Coffin,* 4 Mass. 1 (1803), as does Jefferson and Madison's joint remark that in forming a national government, *"the laws and principles remained unaltered which privileged the representative functions,* whether to be exercised in the State or General Government, against the cognizance and notice of the co-ordinate branches, Executive and Judiciary...." T. Jefferson (and J. Madison), Protest to the Virginia House of Delegates (1793), *reprinted in* 2 *The Founders' Constitution* 336 (P. Kurland & R. Lerner ed. 1987) (emphasis added).

Still, it might be objected, conditions have changed sufficiently since 1833 to require modification or, as here, outright reversal, of the common law principle subjecting elected representatives to libel suits. This objection is conclusively defeated in *Proxmire,* where the Supreme Court cites, in an extended discussion, *Creevey, Lord Abingdon,* Story, related sources, and prior Court precedent with *unequivocal approval.* 443 U.S. at 128–30, 99 S.Ct. at 2684–85. It is implausible that the Court relied on this authority to limit the reach of the Speech or Debate Clause, yet meant at the same time to reject this au-

thority if invoked under the rubric of official immunity.

The common law also provides a sufficient answer to the dissent's key assumption that legislators should be treated no differently than other official actors. As noted in *Lord Abingdon* and continuously thereafter, the distinctive obligations imposed on legislators require absolute immunity to make law, but privileges extending beyond that threaten the essential obligation to represent the people. By contrast, common law absolute immunity has always extended to those categories of officials who must face daily enforcement decisions. Put another way, the judicially created immunities for judges, prosecutors and executive officials confirm, rather than reverse, common law presumptions.

The absolute immunity granted a judge "for acts within his jurisdiction has roots extending to the earliest days of the common law." *Imbler v. Pachtman*, 424 U.S. at 423 n. 20, 96 S.Ct. at 991 n. 20 (citation omitted). *See also Bradley v. Fisher*, 80 U.S. (13 Wall.) at 353 (1872) (citing, among others, Lord Ellenborough, the Chief Judge in *Creevey*, for the proposition that "no authority had been cited to show that the judge would be liable to an action where he has jurisdiction"); *Stump v. Sparkman*, 435 U.S. 349, 355–57, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978) (approving reasoning of *Bradley*). By common law reasoning, the reach of absolute immunity was extended without difficulty to grand jurors and prosecutors. None of the three could reasonably be expected to perform their duties if threatened with personal liability by aggrieved parties. *See, e.g., Imbler*, 424 U.S. at 422–23, 96 S.Ct. at 991 ("The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." (footnote omitted)); *Yaselli v. Goff*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) (prosecutorial immunity).

The Court built on this tradition to extend the protection of absolute immunity to high-ranking executive officials—originally the Postmaster General. *Spalding v. Vilas*, 161 U.S. 483, 493–98, 16 S.Ct. 631, 635–37, 40 L.Ed. 780 (1896). The case cites extensively to English and American case law upholding the absolute immunity of judges and superior army officers, and concludes:

> We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law.... In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint.

*Id.* at 498, 16 S.Ct. at 637.

The legal theory presented in *Barr* closely tracks the reasoning of *Spalding*, even while the outcome sanctions a greatly broadened scope of immunized activity. In its brief opinion, the plurality declares that immunity cannot for good reason be restricted to superior officials, but must by logic extend down the chain of authority to "officers of lower rank in the executive hierarchy." *Barr*, 360 U.S. at 573, 79 S.Ct. at 1340. The *Barr* decision explicitly takes account of all the known immunities, including the official immunity conferred on legislators by the Speech or Debate Clause. *Id.* at 569–70, 79 S.Ct. at 1338.

In short, the historical record reveals an explicit, previously unquestioned rule of liability for a legislator's published libel on the one hand, and immunity for executive officials, judges, prosecutors, and grand jurors on the other. The accumulated

wisdom accounting for this differentiation counsels against the grant of immunity sought by appellee. The common law commands respect not because it is old, but because it recognizes the need to limit rigorously the privileges available to the representatives of the people. This insight is not growing obsolete, and, as discussed below, it is unaffected by the modern day explosion in executive branch discretionary authority.

### b. Barr *Rationale Does Not Extend to Members of Congress*

In *Barr* the Supreme Court recognized an individual's legitimate right to seek redress for "damage caused by oppressive or malicious action on the part of officials of the Federal Government." *Barr,* 360 U.S. at 565, 79 S.Ct. at 1336. Nonetheless, the plurality concluded that the threat of potential liability would place an excessive burden on the discharge of executive discretionary duties. *Id.* at 572–73, 79 S.Ct. at 1340. The Court has repeated this concern elsewhere. "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute ... [public officials] in the unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) (L. Hand, J.), *cited in Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736; *Nixon,* 457 U.S. at 752 n. 32, 102 S.Ct. at 2702 n. 32; *see also Scheuer v. Rhodes,* 416 U.S. at 239–42, 94 S.Ct. at 1687–89; *Butz v. Economou,* 438 U.S. at 504–07, 98 S.Ct. at 2909–11.

At the same time, the Supreme Court has also made it clear that judicially created immunity should not be granted unless justified by the function served by the relevant official. *Harlow,* 457 U.S. at 810, 102 S.Ct. at 2734; *McMillan,* 412 U.S. at 319–20, 93 S.Ct. at 2028. The nub of the argument sketched by the district court and fleshed out by the dissent is that members of Congress deserve in identical measure, and for the same reasons, the absolute common law tort immunity extended to executive officials. App. at 106; Dissent at 331–32. Although the Court, backed by an extensive common law tradition, would seem to have already concluded that the function of lawmaking does not require official immunity, we address this argument with care.

The privilege of official immunity, technically a defense, would protect elected representatives when and if they should libel private citizens in the pursuit of nonlegislative activities, such as lobbying, answering constituent mail, speaking to the press, raising funds, running for reelection, or responding to the myriad other obligations pressing on elected representatives today. The protection is claimed to be essential to the functioning of good government and ceases only if the representative engages in an act outside the scope of his official authority. In the words of the dissent, "[t]he balance courts have struck in other contexts is the balance I would strike in this case; there is no reason to strike another." Dissent at 333 (citing Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) ("the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.")). Application of this reasoning to members of Congress misfires on grounds that turn ultimately on the conception of representative government established by the Constitution.

Members of Congress have responsibility for making the laws, whereas executive officials must enforce the laws enacted by Congress, and do so in a manner that demands the exercise of enforcement discretion. It is this fundamental *functional* distinction between the obligations of the legislative and executive branches of government that has resulted in the extension of judicially created immunities to the latter. As explained by the plurality in *Barr,* when Congress exercises its power to enact binding law, it places the executive official at risk of suit, like it or not. The need to exercise discretion when enforcing the law justifies the extraordinary remedy

of absolute immunity from common law torts. Otherwise, only the foolhardy or excessively courageous executive official could be counted on to select the course, regardless of the personal consequence, that will in his judgment best achieve the congressional will. *Barr*, 360 U.S. at 571–72, 79 S.Ct. at 1339–40; *Scheuer v. Rhodes*, 416 U.S. at 239–40, 94 S.Ct. at 1687–88.

By sharpest contrast, Congress initiates lawmaking activity, an exercise in the art of declaring the general law that will govern the nation. As a general matter, no authority can compel it to act or control the direction of its lawmaking action once engaged, absent a violation of the Constitution. In this respect, members of Congress enjoy a freedom of action vis-à-vis a coordinate branch not shared by executive officials. At the same time, however, it was wholly evident to the Framers that this freedom did not of itself provide the sufficient safeguard to protect the essential functioning of the Congress from interference by the executive or the judiciary; hence the inclusion of the Speech or Debate Clause. *United States v. Johnson*, 383 U.S. 169, 177–80, 86 S.Ct. 749, 753–55, 15 L.Ed.2d 681 (1966); *Gravel*, 408 U.S. at 617, 92 S.Ct. at 2623.

Within this framework, the precise duties of good government can be weighed, as set forth by Learned Hand in *Gregoire* and adopted by the Supreme Court. Congressman Sundquist has every right to monitor and challenge the manner in which the Legal Services Corporation operates. Within the halls of Congress, he can lobby for its overhaul, engage in oversight hearings, and, should he choose, libel with impunity the reputation and integrity of any lawyer working for the Corporation. When he ventures beyond the protection of his Chamber, he can go to the hustings and loudly proclaim the law's failure. He can use the franking privilege to seek out his constituents' views or promote his own. He can use the issue as a *cause célèbre* to raise funds from likeminded political action committees. He can stand before the press and announce his views. In short, he can attack or defend, as he sees fit, the necessity of a public legal services corporation in general or the manner in which it operates in his own district. No barrier limits his sphere of operation to the confines of the House.

■ By the same token, no imperative of office requires that a member of Congress, *while acting outside the scope of his legislative duties*, be free to reach out with impunity and name names without regard for the consequence to individual reputations. *McMillan*, 412 U.S. at 314, 93 S.Ct. at 2025 ("We do not doubt the importance of informing the public about the business of Congress.... [But a] Member of Congress may not with impunity publish a libel from the speaker's stand in his home district...."). These activities (the dissent notwithstanding) simply do not rise to the level of "constitutional responsibilities," Dissent at 329, that warrant the extension of official immunity to the legislative branch. Nor can it be reasonably postulated that the responsibilities of lawmaking in our constitutional system require a member of Congress to grant or deny privileges in a specific case, impose sentence, bring a prosecution, or apply general law to particular facts or take such other actions that will with predictable regularity expose members of the executive branch to the threat of suit. On those rare occasions when legislative duties require a representative or senator to make specific charges (as in the course of investigative hearings), he can do so under the shelter of the Speech or Debate Clause.

Judge Hand's balance thus weighs in clearly opposite directions for legislators and executives. Executive action at its core would be threatened, and regularly so, without common law tort immunity. Law cannot be enforced in the abstract. Specific persons in specific ways benefit and lose the instant an executive official chooses the manner in which to implement the law. The threat of suit from aggrieved persons constitutes a daily, omnipresent, inescapable threat.

Because of their vastly different obligations, legislators infrequently trench directly on the particular rights of named

individuals. The reported cases in which they have been alleged to do so are rare and almost always present unique considerations. For example, in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), a female employee of Congressman Passman claimed she was dismissed in favor of a less qualified male, thus violating her Fifth Amendment rights. The case provoked no dramatic concern that such suits threaten to paralyze Congress. In fact, the Court, far from avoiding the suit, expressly authorized a cause of action for damages directly under the Constitution. *Cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). This relatively narrow set of suits does not overwhelm the countervailing, deeply held interest in a responsive and responsible legislature.

In fact, the present record is unburdened by evidence to support a claim that members of Congress "who try to do their duty, [live in] constant dread of retaliation," thereby justifying a reversal of the common law. At a minimum, one would think a chorus of comments from the *Congressional Record* could be produced to document at least the perception of a threat, whether real or imagined—unless the dangers so evident to the dissent have to date escaped the attention of the very persons at risk.

Nonetheless, the dissent argues that because a member of Congress is engaged in a host of nonlegislative duties in order to better serve his constituents, he must be granted extraordinary protections against his constituents—and all in the name of good government. Among the many problems with this position is that of distinguishing between congressional activity undertaken to further a constituent's interests and that undertaken to further the member's interest in reelection. The line between the two can be as fine as the line that separates privilege from license; and it takes little imagination to see the ease with which, in the heat of political contest, an immunity from suit for common law libel becomes a license to libel. It is precisely this danger, among others, that gave rise to the common law distinction between speech within the legislative chamber and speech outside it; and nothing has occurred since that precept was given constitutional status in the Speech or Debate Clause to diminish its wisdom.

#### c. Constitutional Privileges

The proposal to shield members of Congress from libel suits implicates the Speech or Debate Clause. *McMillan,* 412 U.S. at 324, 93 S.Ct. at 2030. This is so even though the publication of the Sundquist letter falls squarely outside the constitutional protection. The Speech or Debate Clause ensures that members of Congress can carry out their constitutional obligations:

> In order to enable and encourage a representative of the publick to discharge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense.

J. Wilson, Legislative Department, Lectures on Law (1791), *reprinted in* 2 *The Founders' Constitution* at 331; *Johnson,* 383 U.S. at 179, 86 S.Ct. at 754 (clause "protect[s] against possible prosecution by an unfriendly executive and conviction by a hostile judiciary ... [to] ensur[e] the independence of the legislature"). Beyond that, "good government" demands that elected representatives remain wholly answerable to any person whom they choose to libel or who claims to have been libeled. *McMillan,* 412 U.S. at 320, 93 S.Ct. at 2028 (" '[t]his Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role.' " (quoting *Tenney v. Brandhove,* 341 U.S. at 377, 71 S.Ct. at 788 (brackets original))). Far from threatening government, this public accountability constitutes an essential feature of good government.

The Framers looked to the Speech or Debate Clause as written, and in the context of the broader operation of the Consti-

tution, to assure the "discharge [of the] publick trust with firmness and success." In a display of dramatically reduced confidence, appellee would reject the sufficiency of the constitutional schema and in effect rewrite the clause to read that senators and representatives shall be privileged from questioning in any other place "for any Speech or Debate in either House *or anywhere in respect of common law torts.*"

This expansion of the privilege contravenes Supreme Court direction and constitutional purpose:

> The authors of our Constitution were well aware of the history of both the need for the privilege *and the abuses that could flow from too sweeping safeguards.* In order to preserve other values, they wrote the privilege so that it tolerates and protects behavior on the part of Members not tolerated and protected when done by other citizens, *but the shield does not extend beyond what is necessary to preserve the integrity of the legislative process.*

*Proxmire,* 443 U.S. at 127, 99 S.Ct. at 2684 (quoting *Brewster,* 408 U.S. at 517, 92 S.Ct. at 2540 (1972)) (emphasis added in *Proxmire*).

Moreover, members of Congress receive other unique privileges to assure the ultimate goal of a representative government. For example, Jefferson and Madison, writing jointly, emphasize the central significance of the franking privilege and the privilege against arrest afforded representatives when traveling to and from Congress:

> That in order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law, adopted as the law of this land, that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the co-ordinate branches, Judiciary and Executive; and that their communications with their constituents should of right, as of duty also, be free, full, and unawed by any: that so necessary has

this intercourse been deemed in the country from which they derive principally their descent and laws, that the correspondence between the representative and constituent is privileged there to pass free of expense through the channel of the public post, and that the proceedings of the legislature have been known to be arrested and suspended at times until the Representatives could go home to their several counties and confer with their constituents.

T. Jefferson (and J. Madison), Protest to the Virginia House of Delegates (1793), *reprinted in* 2 *The Founders' Constitution* at 336.

They also mention in this same vein the freedom from arrest, *id.,* while Madison and others speak elsewhere of the need to compensate representatives from the federal, rather than state, treasury to ensure congressional independence. This latter innovation occasioned far and away the most debate among the provisions of Article I, clause 6 by the Framers and Ratifiers. *See* 2 *The Founders' Constitution* at 323–29 (quoting Madison's records of the debates in drafting the Constitution).

In short, the constitutional text speaks in specific terms, and in the very fabric of its design, to the precise concern that representative government fulfill the high ideals envisioned by the Framers. Yet notwithstanding the evident success of the design and despite the abundance of features thought sufficient by the Framers, the dissent would add a novel judicial protection without any evidence of its need, and do so at the risk of undermining the "good government" it so earnestly seeks.

### 3. Circuit Court Precedent

The dissent argues that the present case is controlled by two circuit cases, *McSurely v. McClellan,* 753 F.2d 88, 99–102 (D.C. Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985), and *Walker v. Jones,* 733 F.2d 923, 932–33 (D.C.Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984), and that we "brush[ ] aside clear precedent," Dissent at 328, although, in the next breath, the dissent ad-

mits that "[i]n neither of the prior cases did we reach the issue of what kind of immunity members of Congress have from suits charging violations of the common law, because the suits at issue did not involve such claims." Dissent at 333.

*Walker* is perhaps the oddest of the references in that the *Walker* court expressly holds that "the Supreme Court has instructed that absolute immunity for members of Congress *does not extend* beyond the scope of the Speech or Debate Clause." *Walker,* 733 F.2d at 932 (emphasis added). Yet the dissent says the case "compel[s]" the result here, namely that absolute immunity *does extend* beyond the Speech or Debate Clause. Dissent at 328. This is patently untenable.

The balance of the *Walker* court's brief immunity discussion stems from an apparently uncontested assumption that members of Congress may assert *Harlow* immunity with respect to statutory and constitutional torts. Judge MacKinnon in dissent called attention to the "puzzling" quality of this dictum. *Id.* at 937 n. 7 ("In light of the Supreme Court's ruling that Speech or Debate immunity constitutes the *sole* separation-of-powers barrier to adjudication of such cases, the majority's indication that qualified official immunity might shield defendants from liability in this case is puzzling." (emphasis original)) (MacKinnon, J., dissenting). One can extract at most a tentative indication from the unexplored assumption in *Walker;* surely no blanket grant of immunity from common law suits follows from these terse references to qualified constitutional and statutory immunity added at the end of the *Walker* opinion. We are all the more convinced that *Walker* does not constrain our full examination of the issue here by the conclusion of the two-paragraph discussion in that case: "The blank record and misdirected argument now before us, in short, supply no justification for dismissing this action on a qualified immunity ground." *Id.* at 933 (footnote omitted).

The "precedent" for the grant of immunity from common law torts thus whittles down to a two-page discussion in *McSurely*

extending qualified immunity for a constitutional tort to a senator and his counsel accused of participating in an unconstitutional seizure of private papers, and to the congressional aide who in fact executed the inspection and transportation of the documents in question. As noted, the jurisprudence analyzing statutory and constitutional torts stands distinct from that applied to common law torts. *See supra* at 315–16. Hence, at best, *McSurely* constitutes a fulcrum, as opposed to precedent, for asserting a parallel grant of absolute immunity. The argument is not compelling on several counts.

First, as with *Walker,* the *McSurely* court essentially assumes without discussion that qualified immunity, granted to executive officials in *Harlow,* properly and necessarily extends to members of Congress. We have no warrant in this case to directly address the validity of this assertion. Two comments, however, are appropriate. By extension of the arguments presented here, Speech or Debate immunity may avoid the need for qualified immunity from constitutional and statutory torts, as well as for immunity against common law torts. Alternatively, it may be that distinct treatment is warranted for common law torts, whose elements are well established and hence have no need for absolute immunity, versus constitutional and statutory torts, where, as *Harlow* makes clear, the violations giving rise to liability may or may not be clearly established. It at least could be imagined that a member of Congress violating a law without adequate notice while pursuing nonlegislative duties requires qualified immunity, whereas there is no warrant for immunity from libel suits. This, however, is speculation properly raised in defense to a case involving a statutory or constitutional violation. As it is, a theory based in the first instance on an unexplored premise of congressional qualified immunity does not compel its extension to absolute immunity from defamation suits. Certainly the argument cannot be made in the name of controlling circuit precedent.

Second, arguments of consistency are always double-edged. Thus, it is worth not-

ing that even as to executive officials, this court and others have questioned whether the goal of vigorous executive enforcement might be better served by qualified rather than absolute immunity. *See Martin,* 812 F.2d at 1428 n. 11. Then–Justice Rehnquist, partially dissenting in *Butz v. Economou,* 438 U.S. at 517, 98 S.Ct. at 2916, took the opposite tack and argued for the extension of absolute immunity for constitutional and statutory tort violations by high-ranking federal executive officials. *Id.* at 529–30, 98 S.Ct. at 2922 (Rehnquist, J., concurring in part, dissenting in part). Judge Mikva would decide against both these arguments as applied to members of Congress, on facts not properly raising the issue, to justify his suggested holding.

Finally, the legal history of the *McSurely* litigation, which stretched over seventeen years, was sufficiently unusual and complex to cause the court itself to admit to a certain judicial exhaustion: "The legal world will little note nor long remember the fine lines that have been drawn in this opinion.... It will be enough if our opinion finally ends this sorry chapter of investigative excess." 753 F.2d at 115. Thus *McSurely* does not seem the firmest rock on which to build a novel privilege.

### 4. Congressional Action

There is a final reason that extension of official immunity by this court is improper. Unlike members of the executive or judicial branches, members of Congress have the unique ability to enact legislation. In this capacity, congressional power could be hypothesized to exist to enact legislation immunizing members of Congress from common law torts. We have no occasion to judge whether such a power, if asserted, would pass constitutional muster. *Compare McMillan,* 412 U.S. at 323, 93 S.Ct. at 2030 (suggesting that Congress could immunize the government printers from damage suits). But the possibility of self-protection, subject to judicial review, makes the judicial rush into the breach all the more inappropriate. Separation of powers counsels as much against a grab of power committed to other branches as it does to extending protection to a branch that may

well have the power to protect itself. If members of Congress in fact believe they require the protection of official immunity, let them so declare and stand accountable to the people for their action.

### C. Defamation and the First Amendment

The Supreme Court has recently summarized the interplay of libel law and the First Amendment:

> When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in *Gertz* [*v. Robert Welch, Inc.,* 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] (1974)], the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet* [*, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)], the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

*Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986).

This issue is not before us. We simply note that the denial of immunity does not mean that members of Congress faced with defamation suits are necessarily limited to common law defenses. *See Butz,* 438 U.S. at 508 n. 35, 98 S.Ct. at 2991 n. 35 (noting, without deciding, that "[t]he defendant official may also be able to assert on summary judgment some other common-law or constitutional privilege."). As to the common law defenses, we underscore that when the Court stated that members of Congress are entitled to "no special immu-

nity from local [defamation] laws," *McMillan*, 412 U.S. at 324, 93 S.Ct. at 2030, it is plain the Court also intended that representatives not be specially deprived of defenses. For example, there may be a qualified defamation defense for "communications from one public officer to another, in an effort to discharge an official duty ..." that would apply to the letters written to the Attorney General and the official at the Legal Services Corporation. Prosser and Keeton on the Law of Torts § 115, at 830 (5th ed. 1984). Whatever the case, our holding does not preclude appellee on remand from asserting all available defenses recognized in the jurisdiction supplying the substantive law.

### III. CONCLUSION

The Speech or Debate Clause provides members of Congress with an immunity that is coextensive with their constitutional responsibilities. When they move beyond the requirements of their legislative responsibilities, they do so as volunteers, and at their own risk, however important their myriad other activities may be in the texture of contemporary political life.

We cannot blind ourselves to the essential distinction between legislative duties imposed by the Constitution and those that may be voluntarily assumed. The work of of the legislative branch is to craft the general rules and policies that the other branches are called upon to apply to specific cases. There is nothing constitutionally required of a senator or representative that cannot be accomplished under the protection of constitutional immunity. It is this clear distinction between inherent and elective duties that disqualifies members of Congress for the grant of official immunity. Elected representatives, in the deepest sense, represent the people. Beyond the necessary privileges granted by the Constitution to legislators, the people ought not to be immunized against themselves.

As Madison warned, "it is against the enterprising ambition of [the legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions." *The Federalist* No. 48,

at 309 (J. Madison) (C. Rossiter ed. 1961). Congressman Madison again put the point eloquently in opposing a statutory proposal to exempt part-time representatives from military service during recess:

> Mr. Madison thought it an important principle, and one that ought in general to be attended to—That all laws should be made to operate as much on the law makers as upon the people; the greatest security for the preservation of liberty, is for the government to have a sympathy with those on whom the laws act, and a real participation and communication of all their burthens and grievances. Whenever it is necessary to exempt any part of the government from sharing in these common burthens, that necessity ought not only to be palpable, but should on no account be exceeded.

J. Madison, The Militia Bill, House of Representatives (Dec. 16, 1790), *reprinted in* 2 *The Founders' Constitution* at 331.

Madison's words sound as loudly today. The decision of the district court dismissing appellant's defamation action against Representative Sundquist is

*Reversed and remanded.*

MIKVA, Circuit Judge, dissenting:

The court today brushes aside clear precedent of this Circuit to reach its holding restricting the scope of congressional immunity. Under today's decision, members of Congress are not accorded even the basic qualified immunity that has routinely been extended to all manner of executive employees acting within the sphere of their employment. In reaching this result, the majority ignores two recent decisions of this court, which explicitly extend official immunity to members of Congress and their staffs.

The court reaches this precedent-denigrating result by mechanically reading the Constitution as if it were a collection of mutually exclusive boxes: because the Congress is given a specific "Speech or Debate" immunity, it holds, Congressmen cannot also qualify for the immunity that courts have given to postmen. Today's holding not only ignores precedent, but

does damage to our governmental structure. Without congressional immunity, we are liable to have a Congress that is deterred from the vigorous exercise of its constitutional responsibilities. As Judge Learned Hand wrote of the immunity doctrine generally, denying government officials its protection "would dampen the ardor of all but the most resolute ... in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949). Because I believe that this Circuit's immunity doctrine precedent and sound public policy considerations compel a holding that Congressmen have qualified immunity from common law tort suits for actions within the sphere of their employment, I dissent from today's decision.

### I.

I agree with the majority that the Speech or Debate Clause does not shield Congressman Sundquist from the instant libel action. The statements at issue in this case were not made in the course of his legislative activities, and the majority is therefore correct in stating that the Supreme Court's holding in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), dictates that the Speech or Debate Clause does not protect them. However, the functions of a Congressman are more than legislative. The efforts of the defendant to call attention to what he considered to be problems within a legal services office were part of his job, and the comments at issue in this case were a part of that effort. As this court has made clear in two recent cases, the defendant's statements should be protected by the doctrine of limited official immunity.

As the majority notes, the Constitution confers immunity on governmental officials only sparingly. The Speech or Debate Clause, as interpreted by the Supreme Court, protects Senators and Representatives from all actions challenging strictly legislative activities. In addition, the provisions of Article II, as read broadly by the Court, protect the President from civil damages actions challenging his official acts. *See Nixon v. Fitzgerald*, 457 U.S. 731, 749–

56, 102 S.Ct. 2690, 2701, 73 L.Ed.2d 349 (1982). The Constitution itself confers no further immunity on governmental officials. In essence, the constitutional scheme, taken alone, allows persons to bring suit against numerous Government officials performing numerous public functions.

However, the Supreme Court has long looked with disfavor on limiting the scope of official immunity to the constitutionality mandated floor. *See, e.g., Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871); *Spalding v. Vilas*, 161 U.S. 483, 498–99, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896). The Court, of course, has recognized the interests counseling against the extension of official immunity; it has taken cognizance of the principle that officials should not occupy a place "above the law." *See Nixon*, 457 U.S. at 758 & n. 41, 102 S.Ct. at 2705 & n. 41. More specifically, the Court has noted the value of allowing individual citizens a right to redress for "damage caused by oppressive or malicious action on the part of officials of the Federal Government." *Barr v. Matteo*, 360 U.S. 564, 565, 79 S.Ct. 1335, 1336, 3 L.Ed.2d 1434 (1959). But the Court has held repeatedly that a competing value justifies granting governmental officials a measure of immunity above the constitutionally established minimum. *See, e.g., id.; Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). This countervailing value is the value of good government. *See, e.g., Barr*, 360 U.S. at 572–73, 79 S.Ct. at 1340 ("The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government."). When a governmental official lives in fear of litigation stemming from his official acts, he will often fail to execute his office and perform his responsibilities with the vigor and decisiveness required by the public good. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974); *Nixon*, 457 U.S. at 752 n. 32, 102 S.Ct. at 2702 n. 32. This consideration has led the Court to fashion an extra-constitutional body of immunity law to supplement the grants of immunity to

governmental officials contained in the Constitution. It is this consideration that the majority ignores in today's decision.

Judicially created official immunity will never insulate a governmental official from all suits. In all contexts, judicially created immunity—unlike the immunity conferred by the Speech or Debate Clause—protects the official from nothing more than civil suits for monetary damages. *See Harlow*, 457 U.S. at 806, 102 S.Ct. at 2732. Moreover, the official immunity doctrine protects a governmental official only from civil damages suits arising out of acts within the scope of the official's authority. *See Nixon*, 457 U.S. at 755–56, 102 S.Ct. at 2704. These two unwavering principles impose a cap on the potential reach of the official immunity doctrine. Under "Speech or Debate" a Congressman's immunity has no such bounds. It is total. A Congressman under its protection may say whatever he wishes and be protected from civil or criminal liability, and even detention or mere questioning. The limited immunity being sought here, however, is of a different stripe.

Within this outer limit, the Supreme Court has, as the majority notes, afforded government officials different measures of immunity depending on the nature of the functions that the official performs. *See Harlow*, 457 U.S. at 810, 102 S.Ct. at 2734 ("[O]ur cases have followed a functional approach to immunity law."). The Court has held that certain kinds of functions are so "sensitive," *id.* 457 U.S. at 746, 102 S.Ct. at 2699—*i.e.,* so necessary to the public good *and* so likely to provoke retaliatory litigation—that when an official performs them, he receives absolute immunity from civil damage suits, regardless of whether these suits charge a constitutional, statutory, or common law violation. *See Butz v. Economou*, 438 U.S. 478, 507, 512, 515, 98 S.Ct. 2894, 2913, 2915, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 425, 96 S.Ct. 984, 992, 47 L.Ed.2d 128 (1976). The Supreme Court has decided that both judicial and prosecutorial functions are of this kind; thus, when governmental officials perform such functions, they are absolutely immune from liability for damages. *See, e.g., Stump v. Sparkman*, 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 231 (1978) (judicial functions); *Imbler*, 424 U.S. at 427, 96 S.Ct. at 993 (1976) (prosecutorial functions). Other official functions, however, require less protection. When officials perform these functions, they receive absolute immunity from damage actions charging common law violations, but only qualified immunity from actions charging constitutional or statutory torts. (Qualified immunity from suits of this kind protects officials insofar as their conduct does not violate clearly established constitutional or statutory norms. *See Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.) The Supreme Court has placed within this category of official functions prototypically executive tasks required or authorized by federal law. *See Butz*, 438 U.S. at 495, 507, 98 S.Ct. at 2911; *Barr*, 360 U.S. at 574, 79 S.Ct. at 1341. The Court has never granted any lesser degree of protection to a governmental official performing an act within his official sphere.

The majority relies for its holding on a stretching of Supreme Court precedent in the immunity area. First, it relies heavily on *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), which declined to extend the Speech or Debate Clause to newsletters or press releases issued by a Senator. The majority reads too much into this case when it says it stands for the proposition that "the Court ... embraced the common law rule of liability for congressional libel...." Majority opinion at 317. The respondent in *Hutchinson* did not claim official immunity; he only claimed immunity under the Speech or Debate Clause. In limiting the application of Speech or Debate Clause immunity to matters within the legislative sphere, the Supreme Court has neither explicitly nor implicitly negated the application of judicially created official immunity to activities outside that sphere. Speech or Debate Clause immunity and judicially created official immunity offer distinctly different protections. The former grants members of Congress a testimonial privilege and pro-

tects them from all civil and criminal proceedings. The latter, in its strongest form, protects officials only from civil suits for damages. The lesson of the Supreme Court cases construing the Speech or Debate Clause is that members of Congress will not receive the blanket Speech or Debate Clause immunity when they act outside the legislative sphere. *Hutchinson* cannot be read to mean that members of Congress will receive *no* official immunity when they act outside that sphere. Thus, to recognize official immunity for members of Congress would not circumvent the Supreme Court's Speech or Debate Clause jurisprudence; rather, it would apply a distinct immunity doctrine in a manner perfectly consistent with the Court's Speech or Debate Clause cases.

The majority fails to pay sufficient attention to a second case primarily involving the Speech or Debate Clause, in which the Court rejected a lower court's decision to use that doctrine to insulate a Congressman acting in an official but non-legislative capacity from grand jury inquiry and possible criminal prosecution. *See Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The Court based its decision solely on the rationale that the judicially fashioned doctrine of official immunity serves only as a shield from civil suits for damages. *See id.* Although we might read into this approach a willingness to apply the doctrine to members of Congress faced with civil damages suits, we cannot say with any assurance that the Supreme Court meant its analysis to bear this weight: the Court may well have meant to avoid the question that confronts the court today. In a footnote in a subsequent decision, the Court succinctly stated that the official immunity doctrine "has been held applicable to officials of the Legislative Branch." *Doe v. McMillan*, 412 U.S. 306, 319 n. 13, 93 S.Ct. 2018, 2028 n. 13, 36 L.Ed.2d 912 (1973). This statement, taken on its face, supports Sundquist's position—indeed, decides this case. But the very brevity of this statement—and its location in a footnote—give some pause. Because it is impossible to discern the precise meaning the Court intended this statement to carry, it cannot be relied upon with great confidence. But it certainly belies the majority's odd assertion that the Court in *Doe* "rejects, in the plainest language, the proposition that members of Congress are entitled to immunity from libel actions." Majority opinion at 11. In sum, the Supreme Court so far has not discussed in any meaningful way the precise question before us; and it certainly has not closed the door to further examination of the question. The inquiry therefore must turn to the underlying purposes of the Court's official immunity doctrine and to this Circuit's prior interpretations of that doctrine.

## II.

The majority is far too dismissive of the important policy considerations militating in favor of congressional official immunity. The purposes underlying the Supreme Court's development of the official immunity doctrine support application of the doctrine to members of Congress performing official functions outside the strictly legislative sphere. The essential role of the official immunity doctrine is to encourage governmental personnel to perform their official responsibilities vigorously and capably by removing the fear of litigation that such performance might prompt. *See supra* at 330. This animating principle is as relevant to the performance of official, albeit non-legislative, functions by members of Congress as it is to the performance of official functions by other governmental officers. That members of Congress have such non-legislative official functions cannot reasonably be denied. The Supreme Court has noted their existence, *see Harlow*, 457 U.S. at 811, 102 S.Ct. at 2734; *Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627, and in doing so, has done no more than recognize and articulate common knowledge. The majority underestimates the role of Congress when they conceive the Congressman's role as limited to "responsibility for making the laws." Majority opinion at 322. That is not the limit that the author of the opinion applied to his role as Congressman, nor that I did to my own. Members of Congress are our citizenry's

primary representatives in the federal government, and the job of representation necessarily entails more than the consideration and enactment of legislation. Moreover, such official functions are of great significance in the workings of our government. In their role as representatives and ombudsmen, members of Congress perform a variety of non-legislative tasks that make this nation's government more responsive to its citizenry and that make this nation's citizenry more attentive to its government. These tasks are entitled to—but more important, these tasks *need*—no less protection than the tasks performed by the vast majority of other government officials in the exercise of their authority. The majority's approach of removing the protection for these functions discourages Congressmen from vigorous action in their non-legislative but official sphere and advances timidity or, worse yet, inaction in a range of governmental functions.

The question remains whether these principles counsel granting members of Congress the greater or the lesser kind of official immunity established by the Supreme Court. I do not believe that official activities of members of Congress outside the legislative core are of a nature as to require that members receive absolute immunity from all civil damages suits challenging official action, regardless of whether they charge a constitutional, statutory, or common law violation. The Court, as I have noted above, has indicated that such broad immunity should accompany only official functions whose exercise is exceptionally likely to prompt retaliatory litigation, such as prosecutorial and judicial functions. *See supra* at 4. The official functions of members of Congress outside the legislative core are not of this kind; they will not frequently provoke civil actions by angry or resentful persons. I would therefore hold that a member of Congress performing official but non-legislative functions is entitled to the kind of official immunity that the Supreme Court has held that government officials performing executive functions enjoy—absolute immunity from damage suits charging a violation of the common law, but only qualified immunity from damage suits charging a statutory or constitutional tort.

### III.

Today's majority opinion marks a dramatic departure from this Circuit's previous holdings in this area. In two recent cases involving statutory and constitutional claims, we held that several members of Congress and their aides (who receive the same immunity as members themselves, *see Gravel*, 408 U.S. at 618, 92 S.Ct. at 2623) were entitled to avail themselves of the official immunity doctrine. *See McSurely v. McClellan*, 753 F.2d 88, 99–102 (D.C.Cir.) (per curiam), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Walker v. Jones*, 733 F.2d 923, 932–33 (D.C.Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). In each case, this court decided that the Speech or Debate Clause provided the congressional defendants with no protection from suit because the challenged acts fell outside the legislative sphere. *See McSurely*, 753 F.2d at 95, 99; *Walker*, 733 F.2d at 932. The panels then went on to probe whether the judicially created doctrine of official immunity shielded the defendants, who were acting within the scope or their official authority. We concluded in each case that the congressional defendants had qualified immunity from the claims; the defendants, the court wrote, would prevail if they had not violated clearly established constitutional or statutory rights. *See McSurely*, 753 F.2d at 99–100; *Walker*, 733 F.2d at 932. In other words, the court in each case held that a member of Congress acting outside the legislative sphere but within the scope of his official authority has the same immunity from constitutional and statutory claims as does a governmental official performing executive functions. *See also Minton v. St. Bernard Parish School Board*, 803 F.2d 129, 135 (5th Cir.1986) (reaching the same conclusion with respect to state legislators, who the Supreme Court has held receive immunity comparable to that of members of Congress).

In neither of the prior cases did we reach the issue of what kind of immunity members of Congress have from suits charging violations of the common law, because the suits at issue did not involve such claims. But it would be odd to say that members of Congress performing non-legislative official functions have the same kind of immunity from suits charging statutory or constitutional torts as governmental officers performing executive functions, but have a lesser kind of immunity (or no immunity at all) from suits charging violations of the common law. Yet this is precisely the anomolous position in which the majority opinion leaves us. In stating that members of Congress performing non-legislative official functions have qualified immunity from suits charging constitutional or statutory torts, I would merely restate the holdings of two prior panels of this court. In stating that members of Congress performing such functions have absolute immunity from suits charging common law torts, I would merely state the obvious and inevitable corollary of these prior holdings.

I realize that the immunity that I would accord to Congressmen is not without cost. Granting members of Congress a measure of official immunity would effectively foreclose a number of meritorious civil damage suits. Some genuinely aggrieved parties would find themselves unable to recover monetary damages for the wrongs that they have suffered. And because at times "it is damages or nothing[,]" *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring), some plaintiffs would be unable to gain any meaningful relief.

I do not deny these costs, and I do not make light of them. Congressmen certainly do not always act wisely or productively, but it is not the function of judges to make that sort of determination. Concededly, for the person aggrieved and in search of a remedy, it is small comfort to know that the judicially created doctrine of official immunity serves the public good. But in determining the proper application of the official immunity doctrine, I would factor in this countervailing value. As Judge

Learned Hand once wrote, "the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrong done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire*, 177 F.2d at 581. The balance courts have struck in other contexts is the balance I would strike in this case; there is no reason to strike another. The commonweal requires vigorous official action by members of Congress no less than by other participants in government. And a measure of immunity is no less a prerequisite of such action in this context than in any other. I would therefore hold, notwithstanding an appreciation of this holding's costs, that members of Congress, like other governmental officials, are entitled to avail themselves of the doctrine of official immunity.

Deciding the immunity issue would not alone decide this case. Even if Congressmen may have official immunity, Sundquist would have official immunity from this libel suit only if he acted within the scope of his official authority when he sent letters to the Attorney General and the Legal Services Corporation and made statements to the press. If Sundquist was acting beyond the realm of his official authority, he could lay no claim to official immunity; he would be liable to the same extent as any private individual.

I would find that all of the acts challenged by Chastain were within Sundquist's official sphere. The Supreme Court has stated in no uncertain terms that exhorting federal officials to take action with respect to governmental matters is activity within the scope of a congressional member's official authority. *See Gravel*, 408 U.S. at 625, 92 S.Ct. at 2627. Sundquist's exhortations to the Attorney General and the Legal Services Corporation to investigate MALS—a federally funded body that Sundquist claimed was obstructing the administration of federal legislation—therefore rank as official activity. I would reach the same conclusion with respect to Sundquist's statements to the press. In

*Barr, supra,* the Supreme Court held that an executive official was acting within the scope of his official authority when he issued an allegedly libelous press release detailing his views on a matter of wide public interest. *See* 360 U.S. at 574–75, 79 S.Ct. at 1341. The Court in that case wrote:

> [W]e cannot say that it was not an appropriate exercise of the discretion with which an executive officer of petitioner's rank is necessarily clothed to publish the press release here at issue.... [A] publicly expressed statement of the position of the agency head ... was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively. It would be an unduly restrictive view of the scope of the duties of a policymaking executive official to hold that a public statement of agency policy in respect to matters of wide interest and concern is not action in the line of duty.

*Id.* Similarly, when a member of Congress makes statements to the press concerning his actions and policies with respect to a matter of interest and importance to his constituents, he acts within the scope of his official authority. Members of Congress, no less than executive officers, have both the authority and the responsibility to keep the public apprised of their activities and positions respecting such matters. Absent this authority and this responsibility, our government, which rests ultimately on an informed public opinion, could not so responsively or ably function. *See Barr,* 360 U.S. at 577, 79 S.Ct. at 1342 (Black, J., concurring) ("The effective functioning of a free government ... calls for the widest possible understanding of the ... service rendered by all elective or appointed public officials or employees."); W. Wilson, Congressional Government 303 (1885) ("It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.... [U]nless Congress [does] these things ... the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct."). Because Sundquist's statements to the press in-

volved a matter of concern and significance to his district—a matter relating directly to the functioning of government—they fell within the scope of his official authority. Sundquist should consequently be able to lay claim to official immunity.

The only remaining question is whether Sundquist would be entitled to absolute immunity or qualified immunity from Chastain's suit. As I have stated, Sundquist would have absolute immunity from a suit alleging a common law tort, but only qualified immunity from a suit alleging a constitutional or statutory wrong. Chastain's complaint charges libel, and courts have held repeatedly that libel, even when committed by a governmental official, is nothing more than a common law tort. *See, e.g., Paul v. Davis,* 424 U.S. 693, 711–12, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). On appeal, however, Chastain argues that his complaint implicitly charges Sundquist with having violated both the First Amendment and certain statutory provisions relating to the Legal Services Corporation. Chastain therefore argued that he has alleged constitutional and statutory violation, from which Sundquist has only qualified immunity. This argument is unpersuasive; the complaint charges neither a constitutional nor a statutory tort. Chastain's complaint alleges only libel, which is a violation of the common law. I would therefore hold that Sundquist has absolute immunity from the suit.

IV. CONCLUSION

In a free society, the power of elected officials is not absolute; it is cabined by the Constitution, by statute, and by common law. But not every transgression of the law by elected officials should give rise to civil liability. When an elected official violates the law in the course of performing functions essential to our government, the interests of private individuals in obtaining redress through monetary damages must sometimes yield to the interests of the broader public. I would therefore hold that members of Congress acting within the scope of their official authority have recourse to the doctrine of official immuni-

ty. In this non-legislative sphere, I would hold that members receive absolute immunity from suits alleging common law torts and qualified immunity from suits alleging statutory or constitutional violations. In writing to the Attorney General and a committee of the Legal Services Corporation about a matter of public interest and importance and in making statements about that matter to the press, I believe Sundquist acted within the scope of his official authority. Because Chastain's complaint alleges only a violation of the common law, I believe Sundquist is absolutely immune from the suit. Therefore, I believe the district court acted appropriately in dismissing the complaint, and would affirm the court's decision. From the majority's complete rejection of any immunity for Congressman Sundquist,

*I dissent.*