[Civ. No. 41790. Second Dist., Div. Five. Feb. 14, 1974.]

PERRY SCOTT, Plaintiff and Appellant, v.
McDONNELL DOUGLAS CORPORATION et al.,
Defendants and Respondents.

COUNSEL

Perry Scott, in pro. per., for Plaintiff and Appellant.

Brill, Hunt, DeBuys & Burby, John R. Johnson, Louis Lieber, Jr., Eberhard Schmoller and James J. McCarthy for Defendants and Respondents.

OPINION

**STEPHENS, Acting P. J.**—Plaintiff Perry Scott appeals from an order of dismissal of his third amended complaint. The complaint sought damages for "defamation; interfering with a contractual relationship; and suffering and emotional distress" while plaintiff was City Manager of the City of Santa Monica. Prior to the dismissal, the court had sustained defendants' demurrer on grounds of uncertainty and for failure to state a cause of action without leave to amend plaintiff's first and third causes of action (defamation, emotional distress and mental suffering, respectively), and with leave to amend his second cause of action (interference with a contractual relationship). Plaintiff failed to amend.

*The Complaint*

In essence, the third amended complaint alleges the following: Prior to publication of the matter complained of, plaintiff enjoyed a good reputation in the community with respect to the high standards of his occupation and the excellence and quality of his work and services rendered to the City of Santa Monica. For sometime prior to December 10, 1970, and subsequent thereto, defendant McDonnell Douglas Corporation by and through its officers, agents, servants and employees (Hochmuth, Latting, and McCloskey)[1] and defendant-Councilmen Hoover, Kingsley and Patton (and a number of Does) unlawfully, intentionally, maliciously and willfully conspired, combined and agreed to enter into a scheme to defame the plaintiff's name and reputation and to cause plaintiff's removal or resignation as city manager. The reason for the conspiracy against plaintiff was

[1]John W. McCloskey, referred to throughout by defendant as McDonnell Douglas' "agent," is a member of the Santa Monica City Council and he is also in the employ of McDonnell Douglas.

because plaintiff was and is an impediment to a zoning ordinance change which would permit a commercial development of McDonnell Douglas' property and property of the City of Santa Monica as to which McDonnell Douglas has an option to purchase. The zoning ordinance would increase the value of McDonnell Douglas' property from $8,000,000 to more than $20,000,000. Councilmen Hoover, Kingsley and Patton, and McDonnell Douglas' agent, McCloskey, did the acts complained of "in excess of their authority and outside the scope of their duties as members of the City Council."

The first cause of action (for defamation) names as defendants McDonnell Douglas, Councilmen Hoover, Kingsley, and Patton (and a number of Does), and alleges that in pursuance of the conspiracy, defendants "without immunity and without privilege published three defamatory letters[2] about and concerning [plaintiff]." The second cause of action (interference with a contractual relationship) names only McDonnell Douglas and the Doe defendants, and alleges that in addition to the publication of the defamatory letters, defendants "in furtherance of their conspiracy and without due process or the consent of [plaintiff] caused the termination of appellant's contract with the [City] and the reduction of his salary in the amount of $6,000 per year, making performance by [plaintiff] more expensive and burdensome in a coercive attempt to force [plaintiff's] resignation." The third cause of action for "mental suffering and emotional distress" names as defendants McDonnell Douglas (and Does) and alleges that "in addition to the acts of unjustifiable interference with plaintiff's contractual relationship, [McDonnell Douglas'] agent, on the 17th day of December, 1970, in pursuance of the conspiracy directed the republication of the letters alleged to be defamatory, and on the 9th day of February, 1971, in continuance of the conspiracy, falsely and maliciously charged [plaintiff] with rigging polygraph examinations, electronic surveillance of city employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

In brief, on or about December 17, 1970, at a meeting of the Santa Monica City Council, defendant Councilman Patton handed to Gene Hall,[3]

---

[2]The specific portions upon which plaintiff bases his three causes of action are discussed *infra.*

[3]According to plaintiff, Hall is a reporter for the Santa Monica City Outlook.

Richard Aronoff, service director for the city, and Earl Reinbold, the city chief of police (who were in the audience) copies of a letter dated December 10, 1970, which he had addressed to plaintiff, and then Patton distributed copies to members of the council, the city clerk, and to plaintiff. According to plaintiff, this letter, among other things, charges him with a lack of moral and ethical character: "I know it can well become the attitude of a dictatorial 'boss' that, having title, you will stoop to any form of action in your power to continue your stay in office."; that plaintiff seeks to impose totalitarian power maintained only through the use of force: "Your past experience in other cities should have proven to you that you cannot be a dictator in a democratic city, even if you are the City Manager and have the power of appointment of the Chief of Police." "For the record I want you, the City Manager, and each of your employees to understand that as long as I serve this city as a City Councilman I will not be horse-whipped or hog-tied by you or any of your employees for doing my duty." "So you choose to write me a letter, releasing a copy to the press, in which you assume the position of not only City Manager but City Attorney, as well as City Dictator."; and charges plaintiff with unethical conduct: "I find it impossible to believe that a City Councilman of this city is required to sit idly by and succumb to malicious character assassination by an employee of that Council, of which he is a member, because he chooses to know what is going on in the various departments of the city."

Plaintiff alleges that the second defamatory letter, dated December 17, 1970, addressed to him, was prepared by McDonnell Douglas through its "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; that this letter was initially published to Peggy Ann Prentice and Alice Hynd;[4] and that this publication was not during a meeting of the city council (though plaintiff did not set forth where the publication did in fact occur). Subsequent to the initial publication of this letter, McCloskey delivered it to Hoover, with directions to her to read the contents at the city council meeting, and Hoover read the contents

---

[4]Defendants raise the point that Prentice and Hynd are secretaries, thus accounting for the fact of the initial limited publication to these two individuals. However, the status of these two parties is not set forth in plaintiff's complaint. Whether the publication to Prentice and Hynd was privileged is an issue which can only be raised by way of an affirmative defense. (*Pavlovsky* v. *Board of Trade,* 171 Cal.App.2d 110 [340 P.2d 63].) However, if the communication itself is privileged, the method of publication will also be privileged if it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793.)

into the record of the meeting, This letter, signed by Councilmen Hoover, Kingsley, McCloskey, and Patton, was a letter of "censure and reprimand," which stated, among other things: "The City Council views with grave concern your complete lack of empathy and understanding of the processes of government in this city. You have failed to recognize that the City Manager has the responsibility to execute the policies laid down by the City Council.

"Your statement showed no understanding of the problems faced by the Council in reaching its decision. However, of a more serious nature is that it indicated the mutinous character to which your administration of the City's affairs has descended."

Plaintiff alleges that the third allegedly defamatory letter (dated December 17, 1970, addressed to plaintiff, and signed by the same four councilmen) was also prepared by McDonnell Douglas' "agents" Hochmuth, Latting, and McCloskey in the executive offices of McDonnell Douglas; it was also initially published to Prentice and Hynd. Subsequent to that publication, McCloskey delivered the letter to Kingsley, with directions for Kingsley to read its contents at the city council meeting of December 17. Plaintiff contends that portions of the third letter defamed him in that the letter portrayed him as dishonest: "A city is most fortunate if it has a City Manager who is dedicated to efficiently and honestly administer the affairs of the City for the people and through the people's elected representatives— the City Council. The people of Santa Monica are not so fortunate."; and that plaintiff has committed prior misconduct: "It appears you are reluctant to learn from your past mistakes. Therefore this Council feels it is necessary to take written action rather than repeated verbal communication when you continue to use the power of your administrative office to influence the legislative functions of government (the City Council)."

Plaintiff's second cause of action is premised upon the tort of interference with a contractual relationship, and alleges that McDonnell Douglas, through its agents McCloskey, Latting and Hochmuth, conspired with members of the Santa Monica City Council to terminate plaintiff's contractual relationship with the city and reduce his salary $6,000 per year in an attempt to coerce plaintiff to resign from his position; that he was so terminated and his salary was so reduced.

Plaintiff's third cause of action sounds also in tort. Liability is predicated upon the theory of intentional infliction of emotional distress, based in large part upon the publication of the statements alleged to be defamatory in the first cause of action. Plaintiff further alleges that certain other state-

ments were made which caused him emotional distress, i.e., "that . . . John W. McCloskey as the agent, servant and employee of McDonnell Douglas Corporation falsely and maliciously charged Plaintiff with rigging polygraph examinations, electronic surveillance of City employees, electronic surveillance of council members, spying on council members, and the use of undue influence on city employees."

We treat the demurrer as admitting all material facts properly pleaded, but not the contentions, deductions, or conclusions of fact or law. We also consider matters which may be judicially noticed. (*Serrano* v. *Priest,* 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].)

The judgment in favor of defendants must be affirmed since Civil Code section 47, subdivision 2[5] provides an immunity under the instant circumstances, and in any case, the allegedly defamatory letters were as a matter of law not libelous per se.

The essential rights and privileges of a legislative body and/or its individual members to be free from the threat of civil suits arising out of discussions in legislative proceedings derives in the main from the English Bill of Rights granted by William and Mary in 1688.[6] In California, this freedom from liability for statements made before a legislative body is codified in section 47 of the Civil Code. The privilege provided by section 47 (subd. 2) has been held to be absolute. (*Albertson* v. *Raboff,* 46 Cal.2d 375, 379 [295 P.2d 405]; *Goodley* v. *Sullivant,* 32 Cal.App.3d 619, 623 [108 Cal.Rptr. 451].) ■ Absolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not defeat the privilege (Rest., Torts, § 586, com. a) when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body. As stated in *Thornton* v. *Rhoden,* 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706, 23 A.L.R. 3d 1152]: "A rule which requires the demonstration of some connection with the proceedings, yet dispenses with the requirement of relevancy, materiality or pertinency, in their technical sense appears to us not only to be a fair compromise between the competing considerations involved, but to be the one adopted by the Restatement of Torts and by at least two decisions in this state. [Citations.]" ■ In the instant case, the al-

---

[5]Civil Code section 47, subdivision 2, in pertinent part provides: "A privileged publication or broadcast is one made—. . . 2. In any (1) legislative . . . proceeding . . ."

[6]1 Wm. & Mary, sess. 2, ch. 2, in pertinent part: "[F]reedom of speech, and debates or proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament."

legedly defamatory statements have a clear connection with the work of the legislative body (the Santa Monica City Council)[7] in that they relate to the retention of an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council. The reading of the letters at the city council meeting was privileged, as was the distribution of copies of the letters to members of the audience (including the press) attending the council meeting. (*Hancock* v. *Burns*, 158 Cal.App.2d 785, 793 [323 P.2d 456]; cf. *Harmer* v. *Superior Court*, 275 Cal.App.2d 345 [79 Cal.Rptr. 855].) Once it is determined that a matter is privileged, the method of publication is privileged as long as it is reasonable and appropriate under the circumstances. (Prosser, The Law of Torts (4th ed.) § 115, p. 793; see also *Dombrowski* v. *Eastland*, 387 U.S. 82 [18 L.Ed.2d 577, 87 S.Ct. 1425]; *Kilbourn* v. *Thompson*, 103 U.S. 168 [26 L.Ed. 377]; Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope*, 99 U.Pa.L.Rev. 960.)[8]

Plaintiff's reliance upon *Bradley* v. *Hartford Acc. & Indem. Co.*, 30 Cal.App.3d 818 [106 Cal.Rptr 718] is misplaced. That case involved a defamation action arising out of libelous statements relative to a personal injury action contained in an extrajudicial document filed in both the Nevada Supreme Court and in the district court where the personal injury suit was to be tried. In *Bradley,* the court held (at p. 826): "It is conceded that, due to filing the documents with the courts, 'some relationship' can be established between the publication of the contents of these documents and the action itself. However, as indicated before, the fulfillment of this requirement, standing alone, does not sustain an absolute privilege. This is particularly true in the instant case where there is nothing contained in the pleadings to suggest that the publication was made to achieve the objects of the litigation. On the contrary, it affirmatively appears in the Complaints that the documents in question were filed as a part of a conspiracy for the sole purpose of having the defamations contained therein

---

[7]The privilege provided in section 47, subdivision 2, is broad and comprehensive, including proceedings of all legislative bodies, whether state or municipal. (*Pettitt* v. *Levy,* 28 Cal.App.3d 484, 488 [104 Cal.Rptr. 650]; *Kelly* v. *Daro,* 47 Cal.App.2d 418, 421 [118 P.2d 37].)

[8]The Brown Act (Gov. Code, § 54950 et seq.) requires legislative bodies of local agencies to meet in open and public sessions. It is the law's intent that deliberation as well as action occurs openly and publicly. (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.,* 263 Cal.App.2d 41, 47 [69 Cal.Rptr. 480].) It would be inconsistent with the spirit of the Brown Act to on the one hand require that legislators operate in a public forum, yet on the other hand, make them vulnerable to a potential civil sanction which would restrict their freedom of expression.

republished by the news media, that is, to bring the defamatory matter within the protective shield of the absolute privilege and then to spread it with impunity. It is easily discernible what result would ensue should we condone such an apparent ruse by providing absolute immunity to the resourceful slanderer. The privileged defamation, now a barely tolerated exception, would gain full-fledged legitimization. All that the slanderer would have to do to avoid the consequences of his evil act would be to file the defamatory matter with the court first, then republish it as an absolutely privileged matter to the news media or to the public at large, thereby converting the litigation in the court into litigation in the press or in the street.

"The above consideration all the more compels the conclusion that in determining whether or not the defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice.* Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other participants." (Italics is original.)

It is clear that in *Bradley,* resort to the court was merely sought as a subterfuge by which the defamatory statements were introduced to the public through the news media, and by which those defendants hoped to immunize themselves against the prospect of liability for the publication of the defamatory material. Plaintiff attempts to analogize that situation with the instant controversy, asserting the principle that the existence of an ulterior motive[9] is sufficient to defeat the privilege even where some connection with a legislative proceeding is shown. We disagree. We note that while the court in *Bradley* conceded that "some relationship" existed between the defamatory statements and the court proceeding, it was at most superficial. Accepting the fact that in *Bradley* the court saw some remote connection, we do not construe that court's analysis as contrary to the result we reach here. In *Bradley,* the court based its decision on the determination that "the defamatory statements here were not uttered on a privileged occasion, nor did they aim at securing the litigants as other participants the utmost freedom of access to the court. But most of all,

---

[9]Attempts to impose liability upon legislators because of their motives for enacting legislation or proposing business for the Legislature have been continually rejected by the courts. As stated by Justice Frankfurter in *Tenney* v. *Brandhove,* 341 U.S. 367, 377 [95 L.Ed. 1019, 1027, 71 S.Ct. 783]: "Legislators are immune . . . not for their private indulgence but for the public good . . . . [T]hat it was not consonant with our scheme of government . . . to inquire into the motives of legislators, has remained unquestioned."

they were not made *to achieve the objects of the litigation* and to promote the unfettered administration of justice." (30 Cal.App.3d 818, 828; italics added.) In the instant case, we find that the contents of the letter adequately related to the matter before the council. ■ Moreover, we recognize that the immunity historically afforded to legislators does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of legislation. Rather, the rule appears well settled that the general immunity afforded legislators extends to all that is spoken or done in the course of legislative proceedings. (*Powell* v. *McCormack*, 395 U.S. 486, 502 [23 L.Ed.2d 491, 505-506, 89 S.Ct. 1944].) The rationale for this extended coverage is that such immunity is essential in that freedom of speech "is inherent in the idea" of a deliberative assembly. (Veeder, *Absolute Immunity in Defamation*, 10 Colum.L.Rev. 131.) While this rule has been subject to some palpable abuses,[10] the benefits far outweigh a narrow interpretation of Civil Code section 47, even though it countenances vehement, caustic, and at times vigorous attacks on government officials. (Cf. *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 [11 L.Ed.2d 686, 700, 89 S.Ct. 710, 95 A.L.R.2d 1412].) This immunity attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body. (*Pettitt* v. *Levy*, *supra*, 28 Cal.App.3d 484, 488; *Whelan* v. *Wolford*, 164 Cal.App.2d 689 [331 P.2d 86].) Since we hold that the statements made and copies of the letters distributed at the city council meeting were privileged, plaintiff's predication of liability upon their utterance and/or distribution *at that* time must fail.

■ Plaintiff contends that in any event the publication of the allegedly defamatory statements to Prentice and Hynd outside of the council chambers was not subject to the immunity provided in section 47, and thus the trial court erred in sustaining the demurrers to the complaint at least insofar as these two publications are concerned. We disagree. ■ Before an action in defamation may be maintained, the tests set forth in *Patton* v. *Royal Industries, Inc.*, 263 Cal.App.2d 760, 765 [70 Cal.Rptr. 44] must be satisfied: "Upon the cause of action for libel a primary question was whether the publication is libelous on its face. (*MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536 . . .; *Cameron* v. *Wernick*, 251 Cal.App.2d 890, 893 . . . .)

---

[10]See, e.g., Yankwich, *The Immunity of Congressional Speech, Its Origin, Meaning and Scope, supra*, 99 U.Pa.L.Rev. 960, 970-973.)

"The question is one of law. The test is whether in the mind of the average reader the publication, considered as a whole, could reasonably be considered as defamatory. [Citations.]

"The court must determine as a matter of law whether the publication is libelous per se. If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader. [Citations.]

"When the material published is unambiguous and in the court's opinion could not reasonably be understood as nondefamatory the issue of libel should not be submitted to the jury. [Citations.]"

 At the time of the utterances and publications complained of, plaintiff was a public official appointed by the Santa Monica City Council. An individual who seeks or accepts public office invites and is properly subject to public criticism so far as it may relate to his fitness and qualifications for his office. As stated in *Eva* v. *Smith,* 89 Cal.App. 324, 329 [264 P. 803]: "The right of criticism rests upon public policy and those who seek office should not be supersensitive or too thin-skinned concerning criticism of their qualifications (Newell on Libel and Slander, 4th ed., p. 536). In commenting upon a published article of the character here involved the supreme court of Nebraska[*] used the following apt language: 'It relates to the fitness of those who adhere to the ruling clique and their conduct in office. It imputes no crime to them. It employs no degrading or insulting epithets toward them, but in extravagant language denounces them as derelict in the duties of their office, unfit, unfaithful, etc. This we understand a political stump orator may do, and outside of ethics there is no rule against using the pulpit for a like purpose. It would be absurd to hold as libelous to say of a candidate for public office that he was utterly unworthy of public confidence. To maintain that proposition, all political arguments are advanced against a candidate. They are sometimes rambling but the law does not undertake to punish the man who sums them up in a single sentence.' (*Arnold* v. *Ingram,* 151 Wis. 438 [Ann. Cas. 1914C, 976, 138 N. W. 111].) And, again, it has been said that it is one of the infelicities of public life that a public officer is thus exposed to critical and often unjust comment; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech. (*Sillers* v. *Collier,* 151 Mass. 50 [6 L. R. A. 680, 23 N. E. 723].) The purpose of the

---

*Sic;* actually, the Supreme Court of Wisconsin.

**290**

rule permitting fair and honest criticism is that it promotes the public good and hence is based upon public policy. (*Trigg* v. *Sun Printing Assn., supra.*) In thus permitting criticism the law gives a wide liberty, there being an honest regard for the truth. Within this limit public journals, speakers, and private individuals may express opinions and indulge in criticism upon the character or habits, or mental or moral qualifications of official candidates (1 Cooley on Torts, p. 443)."

Thus, "it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office." (*Yorty* v. *Chandler,* 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709].) In *Taylor* v. *Lewis,* 132 Cal.App. 381, 385 [22 P.2d 569], such statements were not deemed to be libelous per se: ". . . . [Defendant's] opinion was that '[plaintiffs] did not consistently serve the best interest of the city'; that as members of the majority group 'they usurped the functions of the city manager, dictated appointments in violation of the charter, and forced out of office useful employees of the city'; that they 'had as little respect for sound business usage in their conduct of city affairs as they showed for the charter and the merit system in municipal service'; that they did not always 'take the highest and best bids when selling, and the lowest and best when buying'; that they 'lacked that conscientious regard for the city's interest which makes of public office a public trust'; that by reason of the presence of plaintiff and his associate on the council 'this city has suffered from a lack of confidence in' it, and that business concerns 'have not felt that they could bid on municipal contracts and be sure of receiving impartial consideration,' and that 'they [business concerns] have felt that business with the city has not been on a strictly business basis'; that the 'condition,' in defendant's opinion, 'has hurt the good name of Long Beach and retarded its progress at a time when projects of major importance were to be carried forward.' "

Similarly, in *Eva* v. *Smith, supra* (at pp. 326-327), the following statements were held not to be defamatory per se: " '[My defendant's] desire to see the City of San Mateo advance systematically and along fair and honest businesslike lines compels me to state that these two incumbents [plaintiffs] should not be returned to the City Council.

" 'They have neither the zeal nor the temperament to administer the business of San Mateo under the present charter, as it should be administered.

" 'The best interests of San Mateo require the election . . . of . . . men who are in sympathy with progressive and wholesome measures for the advancement of the City of San Mateo.

" '. . . I am strongly in favor of keeping the City Council free from any suspicion or taint of unfairness in the City's contracts. No contractor should be influenced to buy from any one particular firm.' "

We do not perceive any substantial material difference between the statements found not to be defamatory in *Taylor* and *Eva,* and the allegedly defamatory statements in the instant case. Any reading of the statements would not justify plaintiff's claim that he was exposed to hatred, contempt or ridicule. ▉▉▉ (See *Greenbelt Pub. Assn.* v. *Bresler,* 398 U.S. 6, 13-14 [26 L.Ed.2d 6, 14-15, 90 S.Ct. 1537]; *Corman* v. *Blanchard,* 211 Cal.App.2d 126, 131-132 [27 Cal.Rptr. 327].)[11] The fact that plaintiff takes umbrage at the tone and level of criticism directed against him is not sufficient to sustain an action for defamation. The statements in the instant controversy should be considered in the light of the usual political hyperbole customarily encountered when political figures clash on controversial public matters. An individual in this country has the right to severely criticize the performance of public officials. (*Yorty* v. *Chandler, supra,* 13 Cal.App.3d 467, 473.)

▉ Our disposition of the first cause of action (defamation) also resolves the issues relative to the third cause of action (intentional infliction of emotional distress. (*Pettitt* v. *Levy,* 28 Cal.App.3d 484, 489 [104 Cal.Rptr. 650].) Both causes of action were essentially premised upon the publication of the same statements, except those statements alleged to have caused plaintiff emotional distress which were made on or about February 9, 1971, and charged plaintiff with rigging polygraph examinations, electronic surveillance of city employees and council meetings, spying on council members, and the use of undue influence on city employees. However, as to these latter utterances the complaint fails to allege that these statements were ever published or made known to any third person. Thus an action in defamation would not lie, there being no publication. (*Harris* v. *Zanone,* 93 Cal. 59, 69 [28 P. 845].) Nor, under the facts in this case, is the conduct charged sufficiently outrageous as a matter of law, such as would distress a reasonable man of ordinary sensibilities. (Prosser, The Law of Torts, *supra,* § 12, p. 59.) Thus, an action

---

[11]"In determining the issue of defamation the publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.] If the publication so construed is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded, the demurrer was properly sustained. [Citations.]"

for intentional infliction of emotional distress would not lie for the mere utterance of these statements.

■ Plaintiff's second cause of action sounds in intentional interference with a contractual relationship, i.e., inducing breach of contract.[12] Plaintiff alleges that McDonnell Douglas, through its agents Hochmuth, Latting, and McCloskey, conspired with certain members of the city council[13] to induce the council to terminate plaintiff's employment contract with the city and/or make the performance of his duties as city manager more difficult.

■ The elements of a cause of action for inducing breach of contract are the existence of a valid contract, defendants' intent to induce a breach of the contract, and a breach resulting from defendants' unjustifiable or wrongful conduct. (*Freed* v. *Manchester Service, Inc.,* 165 Cal.App.2d 186, 189-190 [331 P.2d 689]. The last element is the critical one here, for the issue on appeal is whether the complaint on its face showed justification for inducing breach of contract. ■ The general definition of what constitutes justification or privilege is set forth in *Herron* v. *State Farm Mutual Ins. Co.,* 56 Cal.2d 202, 206 [14 Cal.Rptr. 294, 363 P.2d 310], where the court stated: "Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties." (See also *Bledsoe* v. *Watson,* 30 Cal.App.3d 105, 108 [106 Cal.Rptr. 197].) ■ In the instant case, it fully appears from the face of the complaint that plaintiff is a public official, and the efforts directed to obtaining the termination of his services were by way of the expression of defendants' views of plaintiff's fitness and qualifications for office. We have already held that such criticism directed to public officials is not actionable. We do not view this policy so narrowly that it does not encompass reasonable efforts by interested members of the public to *remove* public officials who, in the public's eyes, do not perform their

---

[12]We read plaintiff's complaint liberally. Were we to restrict our review of the trial court's sustaining of the demurrer to the second cause of action to the statements read to the council and prepared by defendants, we would be compelled to affirm on the basis of *Pettitt* v. *Levy, supra,* 28 Cal.App.3d 484, 489. However, we treat the demurrer as establishing the existence of a concerted plan to oust plaintiff from his position as city manager. This presents the question of imposition of liability under a theory of inducing breach of contract between a public official and his employer, the governmental entity.

[13]The city-councilmen defendants in the first cause of action were not named as defendants in this (or the third) cause of action.

duties in a satisfactory manner. In such cases, the privilege provided in section 47 operates to promote the public interest that public officials remain accountable for their activities while in office. To some degree, a public official assumes his office subject to the vicissitudes of public opinion. And to the extent that the changing mood of public opinion operates to interfere with his right to employment, he may not recover in tort under a theory of inducing breach of contract. *Bledsoe* v. *Watson, supra,* 30 Cal. App.3d 105, 110 is ample authority upon which to sustain the judgment of the trial court.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied March 6, 1974, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied April 10, 1974.