**Teri–Ann GROSS**

v.

**Nadine P. WINTER, Councilmember, Council of the District of Columbia, Appellant.**

**No. 88–7214.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1989.
Decided May 26, 1989.

Gregory Mize, with whom Richard Gladstein, Washington, D.C., was on the brief, for appellant.

Stephen L. Braga, Washington, D.C., for appellee.

Harvey L. Reiter, Arthur B. Spitzer, Elizabeth Symonds, William P. Skinner and T. Jeremy Gunn, Washington, D.C., were on the brief, for amici curiae American Jewish Congress, American Civil Liberties Union Fund of the National Capital Area and the Anti–Defamation League of B'nai B'rith, urging affirmation of decision.

Before MIKVA and RUTH BADER GINSBURG, Circuit Judges, and HOGAN,* District Judge.

Opinion for the Court filed by District Judge THOMAS F. HOGAN.

THOMAS F. HOGAN, District Judge:

This case presents the question whether a member of the Council of the District of Columbia enjoys absolute legislative immunity to certain constitutional and common law claims arising out of the member's firing of a legislative researcher. The district court below rejected Councilmember Nadine Winter's absolute immunity defense and denied her motion to dismiss on those grounds. *Gross v. Winter,* 692 F.Supp. 1420 (D.D.C.1988) (Sporkin, J.). She then took the present appeal under 28 U.S.C. § 1291 (1982).[1] For the reasons set forth below, we affirm.

### BACKGROUND

The essential allegations of the complaint are that Councilmember Winter hired Ms. Teri–Ann Gross as a legislative researcher and six months later fired her and called her "incompetent" to the press after denying her leave to observe Jewish holidays and after Ms. Gross had approached the Anti–Defamation League of B'nai B'rith ("ADL"). Like the district court, for present purposes we must accept as true the well-pleaded factual allegations of her Complaint and draw all inferences in favor of Ms. Gross. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Regarding the nature of Ms. Gross's position with Councilmember Winter, the complaint alleges only that "[o]n March 17, 1987, Ms. Gross began a position of employment as a legislative researcher on Ms. Winter's staff and held that position until October 5, 1987," Complaint at ¶ 6, App. at 5, and that "Ms. Gross was hired by Ms. Winter under the excepted service provisions of the District of Columbia Code (*see* D.C.Code § 1–610.1, *et seq.*), and was given a full-time temporary appointment not to exceed April 17, 1988." *Id.* at ¶ 7.

A provision in the referenced Code sections, entitled "Nature of positions in the Excepted Service and conversion rights," provides in relevant part that "[e]ach person holding an excepted appointment under the authority of this section and §§ 1–610.1 and 1–610.3 is intended to be an individual

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. An immediate appeal is permitted from a denial of absolute immunity because the doctrine is designed to protect legislators not only from ultimate liability, but also from the cost and inconvenience of litigation. *E.g., Browning v. Clerk, U.S. House of Representatives,* 789 F.2d 923, 926 n. 6 (D.C.Cir.1986) (citing *Helstoski v. Meanor,* 442 U.S. 500, 507–08, 99 S.Ct. 2445, 2449, 61 L.Ed.2d 30 (1979)), *cert. denied,* 479 U.S. 996, 107 S.Ct. 601, 93 L.Ed.2d 601 (1986).

whose primary duties are of a policy determining, confidential, or policy advocacy character and who reports directly to the head of an agency." D.C.Code Ann. § 1–610.2 (1987).

Councilmember Winter suggests that we draw from this description in the Code inferences regarding the legislative importance of Ms. Gross's position as an employee "intimately involved with policy formation and execution." Brief for Appellant at 6. Ms. Gross, in turn, vehemently resists such inferences on the present record, arguing that "[t]here are so many of these 'excepted service' employees that one must naturally wonder whether the statutory definition relied upon by defendant ... is being applied accurately, or whether most of those employees—including Ms. Gross—simply fall into the 'confidential' rather than the 'policy determining' category." Appellee's Brief at 26–27 n. 20. In our analysis, however, the importance of Ms. Gross's position to Councilmember Winter in the performance of her legislative functions becomes largely irrelevant. *See infra* pp. 172–73.

Regarding the events giving rise to this litigation, the allegations of the complaint paint the following scenario. In April 1987, Councilmember Winter allowed Ms. Gross a day's leave for Passover, but let it be known in her office that she was more pleased with another Jewish employee who had not asked for the day off. Complaint at ¶ 8. In August 1987, when Ms. Gross learned that a close childhood friend had unexpectedly died, she requested leave to attend the funeral in Rhode Island, but Councilmember Winter refused to "rule on her request;" whereupon Ms. Gross went anyway. *Id.* at ¶ 9. As a result, she was placed on "leave without pay status." *Id.* at ¶ 11. Councilmember Winter, however, withdrew that sanction after meeting with Ms. Gross, at the same time warning her that " 'any unexcused absence in the future [would be] unacceptable' and would result in her being 'terminate[d] [from] employment effective the moment [she] left the office.' " *Id.* at ¶ 13.

In September 1987,

Ms. Gross formally requested permission to be absent from work for two days—September 25th and 26th—so that she could observe the Jewish high holy days of Rosh Hashanah. Through a memorandum dated the same day, Ms. Winter denied Ms. Gross' request for leave. The next day, September 9th, Ms. Winter orally stated within the office that religious holidays were not part of her agenda.

*Id.* at ¶ 14. Ms. Gross then contacted the local branch of the ADL, which then interceded with Councilmember Winter on Ms. Gross' behalf via a "third-party." *Id.* at ¶ 15. After this unnamed third-party interceded, Councilmember Winter terminated Ms. Gross effective October 1987, citing "staff reassignments." *Id.* at ¶ 17.

The parties then resorted to the press. On September 22, 1987,

Ms. Gross and the ADL held a press conference to make the public more fully aware of the circumstances surrounding Ms. Winter's termination of Ms. Gross. When Ms. Gross returned from the press conference, she was informed by Ms. Winter that she had been placed on administrative leave status 'effective Tuesday, September 22, 1987 at 4:00 p.m. through Monday, October 5th,' her termination date. On the evening of September 22nd, Ms. Winter voluntarily consented to be interviewed for a WRC–TV, Channel 4, television news broadcast, and made the following statements to her interviewer, and thus to a metropolitan area-wide broadcast audience:

> *Interviewer:* Why did you fire Teri Gross?
>
> *Ms. Winter:* Because she's incompetent.
>
> *Interviewer:* Not because she went to the ADL?
>
> *Ms. Winter:* I did not ... know she had gone to the ADL and didn't know what the ADL was until today, and I fired her and typed a memo on Friday afternoon.

*Id.* at ¶ 18. Finally, on two occasions thereafter "Ms. Winter made oral remarks within her office concerning Ms. Gross which

singled her out for being a member of the Jewish faith." *Id.* at ¶ 19.

Based on her termination and the incidents giving rise to it, in March, 1988, Ms. Gross filed a five-count complaint in the district court. She asserted two constitutional claims under 42 U.S.C. § 1983 for violation of her First Amendment rights to free exercise of religion and freedom of speech; and three common law claims, one for wrongful discharge in violation of public policy, one for slander *per se,* and one for intentional infliction of emotional distress.[2] She further demanded substantial compensatory and punitive damages.

In response, Councilmember Winter filed a motion to dismiss on grounds of absolute legislative immunity and for failure to state a claim. App. at 20. The district court denied the motion from the bench following a hearing on July 8, 1988, *see* App. at 167, and subsequently issued a Memorandum Opinion and Order on August 1, 1988.

Although Councilmember Winter urges us to decide the merits of her motion to dismiss for failure to state a claim, we reach only the question of absolute legislative immunity. Even if we possessed "pendent appellate jurisdiction" to consider the non-immunity issues as Councilmember Winter argues, we would decline to do so.[3] We agree with the district court that these issues should await a more complete factual record.[4] For purposes of this appeal, therefore, we will assume the viability of Ms. Gross's claims.[5]

ANALYSIS

I.

A. *Availability of Immunity to District Councilmember*

■ As a preliminary matter, we must determine whether a member of the Council of the District of Columbia enjoys absolute legislative immunity in any circumstances to suits brought under Section 1983. The District of Columbia, of course, occupies a unique position as the only "federal municipality" in the nation.[6] Councilmember Winter argues, without contradiction from Ms. Gross, that because Con-

2. She later voluntarily dismissed her wrongful discharge claim in light of our decision in *Hall v. Ford,* 856 F.2d 255 (D.C.Cir.1988). *See* App. at 190.

3. In *Abney v. United States,* 431 U.S. 651, 662–63, 97 S.Ct. 2034, 2041–42, 52 L.Ed.2d 651 (1977), the Supreme Court held that, in an appeal based on claims of double jeopardy, non-double-jeopardy-related claims could not be raised unless they independently met the *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), exception for interlocutory appeals.

Councilmember Winter relies on a footnote in *Dellums v. Powell,* 660 F.2d 802 (D.C.Cir.1981), an appeal of a denial of absolute official immunity. This court in *Dellums* declined to reach non-immunity issues for essentially prudential reasons, but noted in *dictum* that the issues "might be made the subject of review in conjunction with our review of defendants' appeal from the collateral order denying absolute immunity." *Id.* at 804 n. 6. *Dellums* makes no reference to *Abney.* In *Browning,* however, this court does cite *Abney* in declining to reach a non-immunity claim, stating that it was "not before the court because on this interlocutory appeal the only question properly before the court is the question of Speech or Debate Clause immunity." 789 F.2d at 930 n. 14.

4. Judge Sporkin stated in closing that he "decided this Motion to Dismiss accepting the well-pled allegations of the complaint as true" and that "[a]s the factual record develops, there may come an appropriate time for defendant to file a motion for summary judgment." 692 F.Supp. at 1427. He thereafter denied Councilmember Winter's motion for stay of discovery pending appeal, which we then granted upon an emergency motion. We lifted the stay of discovery, however, shortly after oral argument.

5. Counsel at oral argument also candidly admitted that Councilmember Winter would claim absolute immunity in this case even if the factual basis for Ms. Gross's claims proved blatantly clear.

6. In pertinent part, Art. I, § 8, cl. 17, of the Constitution provides that Congress has the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of Government of the United States...." In the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), however, Congress granted limited "home rule" to the District. The Act among other things created the thirteen-member Council of the District of Columbia, the enactments of which remain subject to congressional approval.

gress has authorized the Council to exercise the combined powers of a state and a municipal legislature its members should enjoy the same immunities as other state legislators in Section 1983 litigation. Brief for Appellant at 18 n. 10. Although we have not addressed the issue before, we agree and hold that District councilmembers may invoke the same immunities as their state counterparts.

The status of the District of Columbia under Section 1983 has been the subject of both Supreme Court precedent and congressional legislation. In *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the Court held that the District was not a "State or Territory" within the meaning of Section 1983. *Id.* at 432, 93 S.Ct. at 610. Congress thereafter amended Section 1983 to include the District of Columbia within its ambit. Pub. L. No. 96–170, 93 Stat. 1284 (1979).[7] The clear purpose of the amendment was "to give citizens of the District of Columbia rights equal to those of citizens in the states and territories of the United States." H.R.Rep. No. 96–548, 96th Cong., 1st Sess. 1 (1979), U.S.Code Cong. & Admin.News 1979, p. 2609.[8] Moreover, although the subject of legislative immunity apparently never arose, the legislative history of the amendment evinces an intent to bring the District of Columbia within the mainstream of Section 1983 jurisprudence.[9]

At the time the amendment was adopted, that jurisprudence included the Court's decisions in *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), holding that Section 1983 did not abrogate the common law legislative immunity of state and "regional" legislators. The Court in *Lake Country Estates*, however, left open whether such immunity extends to "individuals performing legislative functions at the purely local level." 440 U.S. at 404 n. 26, 99 S.Ct. at 1178 n. 26; *see generally United States v. City of Yonkers*, 856 F.2d 444, 455 (2d Cir.1988), *cert. granted in part and denied in part*, — U.S. ——, 109 S.Ct. 1337, 1339, 103 L.Ed.2d 808 (1989). Although it is not clear exactly where the Council of the District of Columbia should fall on this state, regional, and local scale, we find its members at least comparable to those of the regional planning authority that were granted immunity in *Lake Country Estates*.

That Councilmember Winter is entitled to invoke the doctrine of absolute legislative immunity in a Section 1983 suit, however, only begins our analysis. As Ms. Gross points out, "[t]his appeal involves no challenge to the general principle of legislative immunity, but only to its applicability on the peculiar facts of this case." Brief for Appellee at 19. As discussed below, the doctrine protects legislators only in the exercise of legislative functions, not adminis-

---

**7.** The jurisdictional complement to Section 1983, 28 U.S.C. § 1343, was simultaneously amended to add subsection (b), which provides that:

> For purposes of this section—
> (1) the District of Columbia shall be considered to be a State; and
> (2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

*Id.*

**8.** At the hearings on the bill, the then current chairman of the Council, among others, strongly supported the measure without reservation. *See Civil Suits for Violation of Civil Rights: Hearings and Markups on H.R. 3343 Before the Subcomm. on Judiciary, Manpower, and Education and the Comm. on the District of Columbia, House of Representatives,* 96th Cong., 1st

Sess. 4 (1979) U.S.Code Cong. & Admin.News 1979, p. 2612 (prepared report of Arrington Dixon, Chairman, Council of the District of Columbia).

**9.** For example, in several instances the intent to apply the Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), to the District is mentioned. *E.g.,* H.R.Rep. No. 96–548, *supra,* at 2, U.S.Code Cong. & Admin.News 1979, p. 2610. In fact, even before the amendment became applicable and when *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), was the only vehicle for constitutional tort suits against the District, this court held that *Monell's* proscription against *respondeat superior* liability applied equally to the District. *See Tarpley v. Greene*, 684 F.2d 1, 9–11 (D.C.Cir.1982).

trative functions—and this case falls in the latter category.

## B. *Personnel Decisions as Administrative Functions*

State officials in Councilmember Winter's position are granted " 'absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities.' " *Lake Country Estates,* 440 U.S. at 405 n. 30, 99 S.Ct. at 1179 n. 30 (quoting *Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978)). "Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988) (emphasis in original). In the case of legislators, absolute immunity is designed to preserve legislative independence from outside interference. *See Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 731–32, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980). Legislators are thus accorded absolute immunity "not for their private indulgence but for the public good." *Tenney,* 341 U.S. at 377, 71 S.Ct. at 788.

In the present case, the district court held that Councilmember Winter was not entitled to absolute immunity for the personnel actions at issue because they were taken in her administrative, not legislative, capacity. The district court reasoned that

> [h]ere, [Councilmember Winter] was not engaged in a traditional legislative function; she was neither enacting legislation nor participating in a committee investigation. Nor was she working on any particular project which might be characterized as a traditional legislative function. Rather, she was engaged in an administrative function, that of dealing with her staff.

692 F.Supp. at 1425.

Councilmember Winter seeks on appeal to shift the focus from the functions she was exercising to those Ms. Gross was hired to exercise, arguing that Ms. Gross's duties "were integrally related to the due functioning of the legislative process." Brief for Appellant at 16. She relies principally on this court's decision in *Browning v. Clerk, U.S. House of Representatives,* 789 F.2d 923 (D.C.Cir.), *cert. denied,* 479 U.S. 996, 107 S.Ct. 601, 93 L.Ed.2d 601 (1986), a case the district court distinguished on the grounds that its holding "is restricted to members of Congress." 692 F.Supp. at 1424. Ms. Gross argues with even greater force than the district court, however, that *Browning* is undermined by the Supreme Court's later decision in *Forrester.*

There is unquestionably tension between precedent of this court, which has "identified the ultimate issue to be the *duties of the employee* " in the context of immunity for congressional personnel decisions, *Browning,* 789 F.2d at 928 (emphasis in original), and *Forrester,* which accords no weight to the duties of the employee, "even though they may be essential to the very functioning of the" state institution at issue, 108 S.Ct. at 544.

*Browning* involved a racial discrimination suit arising out of the discharge of an Official Reporter of the United States House of Representatives. After reviewing the authorities, this court adopted the following immunity standard in the context of congressional personnel decisions: "whether the employee's duties were *directly related to the due functioning of the legislative process.*" *Browning,* 789 F.2d at 929 (emphasis in original). Thus, under *Browning,* if the employee's duties are "such that they are directly assisting members of Congress in the 'discharge of their functions,' personnel decisions affecting them are correspondingly legislative and shielded from judicial scrutiny." *Id.*

The congressional defendants in *Browning* were deemed absolutely immune under that standard due to the importance of the legislative matters the Official Reporter recorded, and despite the district court's finding that she was merely " 'the human equivalent of a tape recorder,' " *id.* at 928 n. 11 (quoting trial transcript). *Id.* at 929–30. This court's primary concern in grant-

ing immunity was that the trial court would otherwise have to inquire into "matters at the very heart of the legislative process, such as the nature of the hearings to which Browning was assigned, the purposes underlying those hearings, and whether Browning's performance frustrated those purposes." *Id.* at 930.

*Browning* attempted to clarify, or qualify, this court's earlier decision in *Walker v. Jones,* 733 F.2d 923, 930–31 (D.C.Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984), in which we reached the opposite result where the discharged employee was a manager of the House of Representatives' restaurants. *Walker* rejected as "far-fetched" the congressional defendants' equation of the restaurant manager to the legislative aide in *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and reasoned that "[t]o characterize personnel actions relating to such [restaurant] services as 'legislative' in character ... is to stretch the meaning of the word beyond sensible proportion." 733 F.2d at 931. *Walker* expressly reserved two "broader" questions: (1) Does Speech or Debate Clause immunity apply *at all* to decisions to dismiss persons employed by the legislative branch, *id.* at 930 (quoting *Davis v. Passman,* 544 F.2d 865, 880 (5th Cir.1977), *rev'd on other grounds,* 571 F.2d 793 (5th Cir.1978) *(en banc), rev'd,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)); and (2) if the immunity applies in at least some cases, it is limited to "the hiring and firing of congressional staff members who have 'a meaningful input into ... legislative decisionmaking.'" *Id.* (quoting *Davis,* 544 F.2d at 880–81 n. 25). The immunity standard this court later articulated in *Browning* was designed to close the questions *Walker* left open;

*Browning* answered "yes" to the first and "no" to the second.

The Supreme Court's strict "functional" immunity analysis in *Forrester,* however, contrasts with the employee-centric approach this court took in *Browning. Forrester* held that a state-court judge did not enjoy absolute judicial immunity to a Section 1983 damage action arising out of his discharge of a probation officer. 108 S.Ct. at 545–46. Yet the import of the case extends beyond state-court judges and probation officers. The Court's holding was informed by a common theme it discerned in its immunity precedents. The Court explained that,

> [a]ware of the salutary effects that the threat of liability can have ... as well as the undeniable tension between official immunities and the ideal of the rule of law, this Court has been cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court. Running through our cases, with fair consistency, is a "functional" approach to immunity questions other than those that have been decided by express constitutional or statutory enactment. Under that approach, we examine the nature of the function with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.

108 S.Ct. at 542. And, in this vein, the Court stressed that it is "the nature of the function performed, not the identity of the actor who performed it, that informed [its] immunity analysis." *Id.* at 545; *see also Rateree v. Rockett,* 852 F.2d 946 (7th Cir. 1988).[10]

---

10. *Rateree* involved a Section 1983 suit by city employees against the City of Harvey, Illinois, and three members of the city council, arising out of the Council's elimination of the employees' jobs through a budget action. After holding that the city councilmembers were entitled to invoke the doctrine of absolute legislative immunity, the court held that they were immune for the budget action eliminating the employees' jobs. 852 F.2d at 949–50. In so holding, the court rejected the employees' argument that the

budget action was administrative under *Forrester. Id.* at 950. The court reasoned as follows:

> Plaintiffs submit that because their jobs were terminated by defendants, the defendants' conduct was necessarily administrative since it involved employment decisions. We agree with plaintiffs to the extent that employment decisions generally are administrative, regardless whether made by a judge or a legislature. *See, e.g., Forrester,* 108 U.S. S.Ct. at 538 (no judicial immunity for firing of probation offi-

Under this functional approach, the *Forrester* Court held that the state-court judge was acting in an administrative, not judicial, capacity in his decisions to demote and discharge the probation officer. 108 S.Ct. at 545. It reasoned that the decisions "were not themselves judicial or adjudicative." *Id.* Moreover, the judge's personnel decisions were not immunized even though the probation officer "performed functions that were 'inextricably tied to discretionary decisions that have consistently been considered judicial acts,'" *id.* at 541 (quoting Seventh Circuit's majority opinion below), and even though such personnel decisions "may be essential to the very functioning of the courts," *id.* at 544.

In light of this, we can see no basis for distinguishing the importance of a probation officer's functions to a state-court judge from the importance of a legislative researcher, or aide, to a state legislator. Indeed, probation officers and legislative aides have both similarly been accorded "derivative" immunity due to the importance of their functions to their principals. *See Gravel,* 408 U.S. at 616–18, 92 S.Ct. at 2622–24; *Turner, II v. Barry,* 856 F.2d 1539 (D.C.Cir.1988) (*per curiam*). *Gravel* held that a legislative aide to a member of Congress shares in the member's Speech or Debate Clause immunity to the extent the aide assists in the performance of legislative acts, reasoning that "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos." 408 U.S. at 616–17, 92 S.Ct. at 2623. Similarly, in *Turner* this court held that a probation officer enjoys derivative judicial immunity

in preparing a presentence report for a judge, reasoning that "probation officers typically serve as an '"arm of the sentencing judge"'.... [and] the prospect of damage liability under section 1983 'would seriously erode the officer's ability to carry out his independent fact finding function' and would, as a result, 'impair the sentencing judge's ability to carry out his judicial duties.'" *Id.* at 1540 (quoting *Demoran v. Witt,* 781 F.2d 155, 157 (9th Cir.1986) (quoting *Cleavinger v. Saxner,* 474 U.S. 193, 204, 106 S.Ct. 496, 502, 88 L.Ed.2d 507 (1985))).

The functions of probation officers and legislative aides are therefore equally important to the due functioning of the judicial and legislative processes, respectively. Nonetheless, under *Forrester,* the functions judges and legislators exercise in making personnel decisions affecting such employees are administrative, not judicial or legislative. *Forrester's* functional approach also forecloses the somewhat curious logic that the greater the employee's importance to the legislative process the greater should be the state legislator's freedom to violate that employee's constitutional rights.

■ On the weight of this authority, therefore, we find *Forrester,* not *Browning,* controlling in the present case. However, we do not reach the question whether special considerations applicable to members of Congress, such as separation-of-powers concerns, continue to justify the absolute immunity standard for congressional personnel decisions adopted in *Browning.*[11]

cer by judge because of sex); *Davis v. Passman,* 442 U.S. 228 ... [99 S.Ct. 2264, 60 L.Ed.2d 846] (1979) (no legislative immunity for member of Congress for firing of staff employee because of sex). Plaintiffs' position, however, would turn every budget decision into an administrative one. This backdoor approach is unacceptable.
*Id. Rateree* may be seen as an example of the type of personnel actions, *i.e.,* those flowing from traditional legislative functions like budget decisions, for which legislators continue to enjoy absolute immunity after *Forrester.* The *Rateree* court's parenthetical on *Davis,* however, misstates the Supreme court's holding in that case. *Davis* expressly did not reach the legisla-

tive immunity issue, and the somewhat opaque reference to *Davis* in *Forrester,* 108 S.Ct. at 542–43, does not hold otherwise.

**11.** In distinguishing *Browning,* the district court in the present case reasoned that, "the principle of separation of powers is inapplicable to an analysis of absolute legislative immunity for a City Councilmember in the federal courts because the local legislature and the federal judiciary are not coordinate, equal branches of government." 692 F.Supp. at 1425. The Supreme Court, however, has stated that [a]lthough the separation-of-powers doctrine justifies a broader privilege for Congressmen than for state legislators *in criminal actions,*

In sum, we hold that Councilmember Winter is not absolutely immune to Ms. Gross's constitutional claims under Section 1983, because Councilmember Winter's contested personnel decisions were taken in her administrative, not legislative, capacity.[12]

## II.

■ Councilmember Winter also claims absolute legislative immunity to Ms. Gross's remaining common law claims under the District's local speech or debate statute, D.C.Code Ann. § 1–223 (1987), which was enacted by the Council and approved by Congress in 1976. Specifically Councilmember Winter argues that "in the District of Columbia legislative immunity provides greater protection to local legislators against common law claims than the Speech and Debate Clause or federal common law recently have been interpreted to provide Members of Congress." Brief for Appellant at 33. The district court dispensed with this defense in a brief footnote that "the 'local speech and debate' clause, ... will certainly provide no more protection than the federal common law." 692 F.Supp. at 1427 n. 7. Upon analysis, we agree with the district court.

Councilmember Winter's argument that District law provides greater immunity than federal law is designed to avoid the adverse holdings of *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed. 2d 411 (1979) and *Chastain v. Sundquist*, 833 F.2d 311 (D.C.Cir.1987), that members of Congress are not immune to common law defamation suits for statements made outside the legislative sphere. In support of the argument she submits that other jurisdictions have accorded their legislators immunity to common law claims broader than that enjoyed by members of Congress. Brief for Appellant at 31–33 (citing *Cosme*

*v. Town of Islip*, 102 A.D.2d 717, 476 N.Y. S.2d 857 (N.Y.App.Div.), *aff'd*, 63 N.Y.2d 908, 472 N.E.2d 1033, 483 N.Y.S.2d 205 (1984); *Scott v. McDonnell Douglas Corp.*, 37 Cal.App.3d 277, 112 Cal.Rptr. 609 (1974); *Abercrombie v. McClung*, 55 Haw. 595, 525 P.2d 594 (1974)). Regardless of what other jurisdictions may have done, however, we find no support in the text or legislative history of the District's speech or debate statute for extending it further than the constitutional provision.

The District's legislative immunity statute provides that:

> For any speech or debate made in the course of their legislative duties, the members of the Council shall not be questioned in any other place.

D.C.Code Ann. § 1–223. The term "legislative duties" is in turn defined as follows:

> "Legislative duties" shall include the responsibilities of each member of the Council in the exercise of such member's functions as a legislative representative, including but not limited to: Everything said, written or done during legislative sessions, meetings, or investigations of the Council or any committee of the Council, and everything said, written or done in the process of drafting and publishing legislation and legislative reports.

*Id.* at § 1–222. There are no District of Columbia Court of Appeals decisions interpreting these provisions.

What legislative history exists confirms the obvious fact that section 1–223 is "modelled upon the 'speech and debate' clause of the Constitution of the United States." *Report on Bill No. 1–34, "Legislative Privilege act of 1975," Comm. on the Judiciary & Criminal Law, Council of the District of Columbia* 1 (Dec. 4, 1975). The above Report also explains that:

---

12. United States v. Gillock, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), we generally have equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressman under the Constitution." *Supreme Court of Virginia*, 446 U.S. at 733, 100 S.Ct. at 1975 (emphasis added). This indicates that separation-of-powers concerns may not factor in civil cases.

12. However, although we do not reach the question, qualified immunity may be available to Councilmember Winter. *See Forrester*, 108 S.Ct. at 545; *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Walker*, 733 F.2d at 932; *McSurely v. McClellan*, 753 F.2d 88, 99 (D.C.Cir.1985).

"Legislative duties" is defined in order to provide a liberal scope to the "speech and debate" immunity in section 3. Legislative duties are defined so as to include genuine legislative functions which are exercised beyond the mere confines of the Council Chambers or a committee meeting place.

*Id.* at 3. Councilmember Winter relies principally on this last passage in arguing that the District's statute provides greater protection than the Speech or Debate Clause of the Constitution. Yet the Supreme Court has similarly "given the [federal] Clause a practical rather than a strictly literal reading which would limit the protection to utterances made within the four walls of either Chamber." *Hutchinson v. Proxmire,* 443 U.S. at 124, 99 S.Ct. at 2683.

Councilmember Winter's interpretation is also in derogation of the common law. *See Hutchinson,* 443 U.S. at 127–30, 99 S.Ct. at 2684–86. The Council was presumably aware of this, as the Office of the Mayor commented on the bill that "it has been held that a member of the legislative body cannot take advantage of his official position to give expression to private slanders for a malicious purpose." Memorandum from Judy Rogers, Special Assistant for Legislation, Office of the Mayor, to David Clarke, Chairman, Committee on the Judiciary & Criminal Law, D.C. Council (Jan. 16, 1976) (commenting on Bill 1–34). We are therefore not convinced—and we see no evidence that Congress was convinced in approving the measure—that the District's speech or debate statute is broader than the Speech or Debate Clause of the Constitution. Accordingly, we hold that Councilmember Winter does not enjoy absolute immunity to Ms. Gross's common law claims on the basis of the District's speech or debate statute.

## Conclusion

Judge Posner wrote in his dissent in *Forrester,* later virtually adopted in whole by the Supreme Court, that "[t]he only tenable rationale of absolute immunity is the need to protect officials from being seriously deflected from the effective performance of their duties," and that "[a]bsolute immunity is strong medicine, justified only when the danger of such deflection is very great." *Forrester v. White,* 792 F.2d 647, 660 (7th Cir.1986) (Posner, J., dissenting), *quoted in Forrester,* 108 S.Ct. at 545. We are compelled to find in this case, as the Supreme Court did in *Forrester,* that "[t]he danger here is not great enough." 108 S.Ct. at 545.